ROBERT R. MIDKIFF AND EVANITA S. MIDKIFF, PETITIONERS *v.* COMMISSIONER OF INTERNAL REVENUE, RESPONDENT

Docket No. 12433-89.        Filed May 22, 1991.

*George G. Grubb,* for the petitioners.
*Henry E. O'Neill,* for the respondent.

## OPINION

COHEN, *Judge:* Respondent determined a deficiency of $40,635 in petitioners' Federal income tax for 1986. The sole issue for decision is whether petitioners are entitled to an interest expense deduction under section 163(a) for an amount paid incident to petitioners' purchase of a fee-simple interest in residential real property in settlement of condemnation proceedings commenced under the Hawaii Land Reform Act of 1967, Haw. Rev. Stat. ch. 516 (HLRA).

Unless otherwise indicated, all section references are to the Internal Revenue Code as amended and in effect for the year in issue. All of the facts have been stipulated. The stipulated facts are incorporated as our findings by this reference.

## Background

Petitioners are husband and wife and resided in Honolulu, Hawaii, at the time they filed the petition in this case. Their residence was situated on a residential lot that prior to 1986 was leased from its fee owner, the trustees under the will and of the Estate of Bernice Pauahi Bishop, deceased (the estate).

This case and other cases involving similarly situated taxpayers are part of a litigation project that has been denominated "Summblight." Certain of the other taxpayers with docketed cases currently pending before this Court have executed written documents agreeing to be bound by the result in this case (Summblight petitioners). Some of the Summblight petitioners were litigants in HLRA condemnation actions commenced against the estate, other than the action involving petitioners, while other Summblight petitioners were involved in HLRA condemnation actions commenced against landowners other than the estate.

### Overview of the Hawaii Land Reform Act

The Hawaii Land Reform Act of 1967, Haw. Rev. Stat. ch. 516, empowers the State of Hawaii, by and through the Hawaii Housing Authority (HHA), to acquire the leased fee interest in certain residential lots by exercising its eminent domain power, or by purchase under the threat of eminent domain, and to transfer the fee interest acquired to the lessee.

The U.S. Supreme Court held that the HLRA satisfies the requirements of the 5th and 14th Amendments of the United States Constitution. *Hawaii Housing Authority v. Midkiff,* 467 U.S. 229 (1984). The Supreme Court delineated the circumstances that led to the enactment of the HLRA. Briefly, the Court explained that Polynesian immigrants who originally settled the Hawaiian Islands developed an economy around a feudal land tenure system in which there was no private ownership of land. Notwithstanding repeated attempts to divide the land, the Hawaii Legislature found that, in the mid-1960s, 47 percent of the State's land was held by 72 private landowners. 467 U.S. at 232. To redress this problem, the HLRA was enacted to create "a mechanism for condemning residential tracts and for transferring own-

ership of the condemned fees simple to existing lessees." 467 U.S. at 233.

The HLRA and HHA Amended Rule 10 (HHA Rule 10), subsequently replaced by title 17, Department of Social Services and Housing, subtitle 5, HHA, chapter 540, set forth the conditions whereby lessees apply to the HHA and request that the HHA purchase the leased fee interests in their lots and thereafter acquire those interests from the HHA. Generally, tenants living on single-family residential lots within certain areas are entitled to request that the HHA condemn the development tract in which their residential lots are located. Haw. Rev. Stat. secs. 516-1, 516-22 (Supp. 1989). When the requisite number of tenants have filed appropriate applications, and certain other conditions are satisfied, the HHA is authorized to "designate" such leased fees for acquisition. The HHA then acquires, at prices set either by condemnation trial or by negotiation between lessors and lessees, the former fee owners' full "right, title, and interest" in the land. Haw. Rev. Stat. secs. 516-22, 516-25, and 516-51 (1985 & Supp. 1989).

As in effect for the year in which the condemnation action in this case was commenced, the amount of compensation to be paid to the lessor was determined by valuing the leased fees as of the date of designation. Haw. Rev. Stat. sec. 516-24 (1976). In 1983, the HLRA was amended to change the valuation date to the date of the summons of the complaint in an eminent domain action. Haw. Rev. Stat. sec. 516-24 (1985). The valuation date was changed so that the date in a condemnation action under the HLRA would be in conformity with the valuation date under general Hawaii condemnation law.

*The HHA Practice and Procedure in Administering the HLRA*

Although the HLRA permitted the HHA to initiate condemnation proceedings of its own accord, the HHA never did so; rather, every HLRA condemnation proceeding conducted by the HHA was initiated pursuant to lessees' requests for designation of development tracts for acquisition under the HLRA. The HHA's practice was to require participating lessees to comply with the requirements of the HLRA and

HHA Rule 10. These requirements included: lessees' submission of proof of financial ability to purchase their leased fees; lessees' deposit of $500 in earnest money to secure their obligations under the HLRA and the HHA's rules; and lessees' written commitment to acquire the leased fees upon acquisition by the HHA.

In order to evaluate participating lessees' proposed proof of financial ability to purchase their leased fee interests, the HHA retained the services of independent appraisers. The independent appraisers typically estimated leased fee market values of representative leased fees in each development tract and adjusted these estimates for the remaining individual leased fees. In arriving at its preliminary estimate of total funds that ultimately would be required from participating lessees, the HHA usually added between 10 percent and 15 percent to the appraisers' estimates to cover legal costs, court expenses, and a 5-percent annual addition that was based on the HHA's interpretation of general Hawaii condemnation law. The HHA was also mindful of the HLRA's goal that leased fees be conveyed to participating lessees.

The HHA's practice was to require participating lessees to establish their financial ability to purchase their leased fees by submitting financial statements and supporting deposit documentation demonstrating their ability to pay the HHA's estimates of leased fee market values. The HHA also required commitment letters from financial institutions for purchase money loans.

Pursuant to the HLRA and its rules, the HHA required lessees who sought to withdraw their residential lots from the HLRA acquisition process to comply with their obligations upon such withdrawal, including payment of their pro rata share of the HHA's costs incurred in that process. The particular lessee's pro rata share was deducted from the lessee's initial $500 earnest money deposit.

Although the HLRA contemplates that the HHA will use its own appropriated funds to acquire leased fees from lessors under the HLRA, the HHA never utilized its own appropriated funds for any such acquisition nor were any such funds appropriated for cases involving the estate. Further, in all HLRA-related leased fee acquisitions, whether

directly between lessors and lessees or utilizing the HHA, the acquisition funds were paid directly by the lessees to the lessors pursuant to escrow agreements. Those funds were not paid under any circumstance to or by the HHA.

. In sum, in administering the HLRA, the HHA never initiated or pursued any HLRA action except upon and pursuant to lessee action; never acquired leased fees for its own account or for disposition to any party other than current lessees; never utilized its own funds for any of its acquisitions; never acquired and reconveyed leased fees at a profit; and, finally, the HHA always enforced the requirements imposed by the HLRA and by the HHA's rules with respect to lessee participation in, and withdrawal from, HLRA actions. The HHA viewed itself merely as the facilitator for participating lessees to acquire their leased fees with their own funds.

*The Kahala Beach Action*

On December 6, 1978, pursuant to the HLRA, petitioners submitted an application to the HHA to purchase the leased fee interest in the lot where their residence was located (the application to purchase). That lot was part of the Kahala Beach Development Tract. In their application, petitioners agreed to and subsequently submitted to the HHA a $500 earnest money deposit. The HHA was authorized to use the deposit to pay petitioners' pro rata share of costs reasonably necessary for the designation and subsequent acquisition of the residential lots, including but not limited to appraisal costs, costs of publication, and survey costs.

Petitioners also submitted certain financial information pertinent to petitioners' ability to purchase their leased fee interest if acquired by the HHA. The required financial information included commitment letters from a bank to grant petitioners a first mortgage loan, in the amount of $150,000, to purchase the leased fee interest.

On January 5, 1979, petitioners and 77 other lessees in the Kahala Beach Development Tract submitted to the HHA a request for designation of development tract (the request for designation). The representations contained in the request for designation were nearly identical to the representations contained in petitioners' application to purchase.

The application that petitioners submitted to the HHA stated:

That Applicant understands and agrees that if, after designation for acquisition of the residential leasehold lot hereby applied for, but prior to acquisition of the leased fee interest in said lot by the [HHA], Applicant withdraws this Application to Purchase * * * , the [HHA] may, at its option, cease all efforts to acquire the leased fee interest of the said lot; that, if the [HHA] chooses to cease acquisition efforts, Applicant shall pay to the [HHA] his pro-rata share of all costs incurred by the [HHA] in the designation and subsequent efforts to acquire the leased fee interest in the residential lots and shall also pay to the [HHA] the actual out-of-pocket expenses of appraisal, survey, and attorney fees that the [HHA] is required to pay the fee owner, the lessor, and the legal and equitable owners of the land so designated but not acquired * * *

In addition, the request for designation submitted to the HHA by petitioners and the other lessees in the Kahala Beach Development Tract contained a provision regarding the parties' obligation to make a continuing offer to purchase their leased fee interest:

*Continuing Offer to Purchase.* Each and every undersigned lessee hereby makes a continuing offer to purchase the leased fee interest in his or her respective residential leasehold lot by contract within sixty (60) days of acquisition of the interest by the [HHA] pursuant to this Request for Designation. The continuing offer to purchase of any undersigned lessee shall become irrevocable for a period of fourteen (14) months upon the designation by the [HHA] of that undersigned lessee's respective residential leasehold lot.

Finally, the application to purchase and the request for designation contained similar provisions regarding the applicant's or lessee's obligation, respectively, to purchase the leased fee interest actually acquired by the HHA. Those provisions are also similar to the HLRA. See Haw. Rev. Stat. sec. 516-30 (1985). The request for designation provided:

*Failure or Refusal to Enter into a Contract to Purchase.* If the [HHA] does designate and acquire the leased fee interest in the residential leasehold lot of any undersigned lessee, but said undersigned lessee fails or refuses to enter into a contract to purchase the leased fee interest within sixty (60) days of acquisition of the interest by the [HHA], subject to the terms, covenants, and conditions determined by the [HHA], then each undersigned lessee who so fails and refuses to enter into a contract to purchase shall pay to the [HHA] his or her pro-rata share of all costs

incurred by the [HHA] in the acquisition of the houselots within the development tract * * *

On January 23, 1981, the HHA designated for acquisition the leased fee interests in petitioners' and the other lessees' lots in the Kahala Beach Development Tract (the date of designation). On January 30, 1981, the HHA filed a complaint in eminent domain against the estate to acquire the estate's leased fee interests in those lots (the Kahala Beach action). The complaint in the Kahala Beach action was filed in the Circuit Court of the First Circuit for the State of Hawaii (the trial court). The HHA joined petitioners and the other lessees as defendants in that action because they had a "direct interest in the amount of compensation and damages" to be awarded and, further, because that "amount will ultimately be borne by the lessees who purchase the houselots [from the HHA]."

Prior to trial, the estate filed a motion requesting a separate trial on the issue of "blight of summons damages." In its memorandum in support of that motion, the estate characterized blight of summons damages as "compensation for delay in payment" and stated that the award of those damages is "premised on the fact that, under Hawaii law, a person's property is considered taken as of the date of summons, and [that person] is entitled to be paid by the condemning authority on that date." Petitioners and the other Kahala Beach lessees filed opposing motions and in memoranda in support thereof argued that the estate was not entitled to blight of summons damages or, alternatively, that the blight of summons damages were limited to interest at 5 percent per year from the date of valuation to the date of judgment. The trial court deferred ruling on the parties' motions until completion of the jury trial in the underlying condemnation action.

On December 13, 1985, the jury in the Kahala Beach action rendered a special verdict determining the fair market values of the estate's leased fee interests in petitioners' and the other lessees' lots. The lots of petitioners and the other lessees who were the original parties to the action were valued as of January 23, 1981, the date of designation; the lots of lessees who were subsequently added to the

action were valued as of May 15, 1981. The jury determined that the leased fee value of petitioners' lot was $473,000.

*Petitioners' Settlement and Purchase*

In April 1986, prior to a ruling on the parties' motions with respect to blight of summons damages in the Kahala Beach action, the HHA, the estate, and petitioners and the other lessees negotiated a settlement of the Kahala Beach action (the settlement). One of the terms of the settlement was that a dismissal of the Kahala Beach action would be filed. The settlement was incorporated into the trial court's stipulation and order of dismissal with prejudice, dated December 12, 1986, wherein the trial court approved the settlement and dismissed the complaint filed by the HHA in the Kahala Beach action (the order). The order also incorporated various settlement-related correspondence between the respective attorneys for the estate, for petitioners and the other lessees, and for the HHA.

Under the terms of the settlement, petitioners and the other lessees in the Kahala Beach action agreed to pay to the estate, for the leased fee interest in their lots, an amount equal to: (a) The jury's verdict on the value of the leased fees as of the date of designation/valuation, plus (b) an additional amount equal to 5 percent per year on the amount described in clause (a) from the date of designation/valuation to the date of petitioners' receipt of legal title to the leased fee, less (c) a credit for lease rents paid during such period. Specifically, the settlement, as incorporated in the trial court's order, provided that:

The Trustees [of the estate] will sell their leased fee interests in the 78 lots as to which the jury set the amounts to be awarded as just compensation.

\* \* \* the sales price of each lot shall be the amount awarded by the jury as just compensation for that lot. In addition, each purchaser shall pay interest at the rate of 5% per annum of that amount (without compounding) from the date of valuation of the lot to the date of closing of escrow. The lease rent paid by the lessee from the date of valuation to the date of closing will be credited against the down payment at the time of closing.

One of the areas of the negotiations that culminated with the settlement and dismissal of the Kahala Beach action

was a request by the lessees that the estate agree separately to state and label as "interest" the blight of summons damages component of the negotiated purchase price. Accordingly, the parties included the following statement in the settlement:

> The [estate has] no objection to the blight damages being identified in the sale documents as interest on the leased fee value, but it must be understood that the total payment for each lot will be the figure represented by the sales price plus 5% simple interest (without compounding) to the date of closing, less lease rent paid between the date of valuation and the date of closing * * * .
>
> * * * It assumes, further that there are no adverse tax consequences to [the estate] arising from inclusion of the language in the sale documents which you wish to have for the benefit of your clients. * * *

The settlement also provided that the lessees who elected not to accept the estate's offer to sell were required to pay their pro rata share of the estate's litigation costs and expenses incurred in the Kahala Beach condemnation action. The pro rata share of the estate's costs for each lot was $7,053.89. The lessees also agreed under the settlement to deposit $10,000 at the time that the lessee actually accepted the estate's offer to sell the leased fee interest. One-half, or $5,000, of this amount was allocated to a fund to assure that the estate was paid the litigation costs and expenses that it incurred in the Kahala Beach action. Several of the lessees who were either original or substituted litigants in the Kahala Beach action did not purchase their leased fee interests. Those lessees reimbursed the HHA and the estate for their respective pro rata share of costs incurred. The HHA did not acquire those leased fee interests, and ownership therein was retained by the estate.

Pursuant to the terms of the settlement, the estate submitted to petitioners an offer to sell the estate's leased fee interest in petitioners' lot (the offer to sell). The terms and conditions contained in the offer to sell were indistinguishable in all material respects from the terms of the settlement. Specifically, petitioners were required to pay their pro rata share of: (1) All costs incurred by the estate and (2) the costs and expenses of the HHA. Petitioners' and the other lessees' pro rata share of the estate's costs and the HHA's costs was $7,253.89. This amount was due and

payable if petitioners did not elect to purchase, or, alternatively, if petitioners initially elected to buy and subsequently elected not to buy.

The estimated purchase price of petitioners' lot was $613,323. That amount was determined as follows:

*Calculation of Sales Price:* As a part of the closing, escrow will calculate the Sales Price as follows:

The amount awarded by the jury as just compensation for your lot; plus

Interest (as awarded by the court in Civil No. 64346) at the rate of 5% per annum of that amount (without compounding) from the date of valuation of the lot to the date of closing, which amount has been calculated to [December 22, 1986.] Please note that this is only an estimate. The actual amount will be determined by the date of closing.

On August 16, 1986, petitioners accepted the estate's offer to sell by executing a reply to proposal. On November 28, 1986, petitioners received legal title to the leased fee interest in their lot upon payment to the estate of the amounts set forth in the settlement. The total price was $611,286.71, which included the $473,000 value established by the jury in the Kahala Beach action and $138,286.71 identified as interest through the date of closing, November 28, 1986.

Petitioners also paid a "Conveyance tax" in the amount of $305.60; the amount of the tax was based on the total price of $611,286.71. Finally, the offer to sell included the following with respect to rent paid to the estate:

*Lease Rent Payments.* As a part of the closing, the lease rent paid by you from the date of valuation will be credited against the cash you are to pay at the time of closing. Escrow will do this calculation.

Petitioners' final buyer statement reflects that petitioners received a credit for lease rent paid in the amount of $14,026.92, which was broken down as follows:

Pro rata items as of 1/23/81

Lease rent 1/23/81 to 5/1/85 @ $910.00/6 MO $7,775.36
Lease rent 5/1/85 to 5/1/87 @ $1,092.50/6 MO $4,369.97
Lease rent 1/23/81 to 5/1/87 @ $150.00/6 MO $1,881.59

Petitioners claimed the $138,286.71 "interest" payment as an interest expense deduction in the amount of $138,287 on

their 1986 Federal income tax return. Respondent disallowed that deduction in his notice of deficiency.

## Discussion

The sole issue for decision in this case is whether the $138,286.71 petitioners paid to the estate is allowable as an interest expense deduction under section 163(a). This amount has been referred to by the parties at various times as "blight of summons damages," "blight damages," or "interest." The labels attached by the parties to the amount at issue in this case are not determinative of Federal tax consequences; similarly, unless otherwise indicated, no legal consequence shall flow from our use of these terms throughout this opinion.

Petitioners initially raised certain evidentiary objections to a supplemental stipulation of facts submitted by the parties. The contents of the supplemental stipulation and the accompanying exhibits generally relate to condemnation actions, other than the Kahala Beach action, that involved the estate or other landowners and Summblight petitioners. Petitioners did not address their objections in their briefs and relied on certain of the documents in their proposed findings of fact and in support of their arguments at various points in their briefs. Thus, the objections have been abandoned. Our disposition of the issue in this case, however, is based solely on the facts and circumstances giving rise to petitioners' claimed interest expense deduction.

Section 163(a) provides that "There shall be allowed as a deduction all interest paid or accrued within the taxable year on indebtedness." The parties agree that section 163(a) generally dictates that the following requirements be met: (a) There is "indebtedness"; (b) the indebtedness is that of petitioners; (c) the payment is of "interest"; and (d) for cash method taxpayers, the interest is paid in the taxable year that the deduction is claimed.

### Indebtedness

To be deductible under section 163(a), amounts paid as interest must be paid on genuine indebtedness. *Knetsch v. United States,* 364 U.S. 361, 365 (1960). Indebtedness is "an

existing, unconditional, and legally enforceable obligation for the payment of a principal sum." *Howlett v. Commissioner,* 56 T.C. 951, 960 (1971). "[A]lthough an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness' within the meaning of section [163(a)]." *Deputy v. du Pont,* 308 U.S. 488, 497 (1940); *Norton v. Commissioner,* 474 F.2d 608, 610 (9th Cir. 1973), affg. a Memorandum Opinion of this Court. The "indebtedness" must be indebtedness in substance and not merely in form. *Knetsch v. United States,* 364 U.S. at 365-366; *Karme v. Commissioner,* 73 T.C. 1163, 1185 (1980), affd. 673 F.2d 1062 (9th Cir. 1982); *Albertson's, Inc. v. Commissioner,* 95 T.C. 415, 421 (1990). Respondent argues that no indebtedness arose that would permit petitioners to deduct the "blight of summons damages" as "interest."

Petitioners argue that an indebtedness arose on January 23, 1981, the date that their residential lot was designated for acquisition and subsequently valued by the jury in the Kahala Beach action. Petitioners contend that this date was the date of "taking," that as of that date the obligation to the estate was "for an ascertainable, quantifiable and measurable amount," and that they were therefore unconditionally obligated at that time to pay the "then fair market value as just compensation to the Estate, all pursuant to the law of Hawaii."

To support their argument, petitioners contend that the law of Hawaii governing general condemnation proceedings "is that condemned property is presumed to have been taken on its date of valuation" and that "an obligation to pay the condemned party just compensation arises on that date, with and as a consequence of the taking." Petitioners assert that these principles apply to HLRA condemnation actions by virtue of Haw. Rev. Stat. sec. 516-23 (1985), which states that, except as otherwise provided, the HHA shall exercise its power of eminent domain in the same manner as in other condemnation proceedings. Accordingly, petitioners contend, an indebtedness arose as of the date of designation to pay to the estate the fair market value of the leased fee interest.

Petitioners rely in part on section 516-30 of the HLRA in support of their argument that the obligation to purchase

was unconditional as of the date of designation. That section provides:

516-30 Purchase of leased fee interest. The lessee of a residential lot within a development tract, whether the lessee was a lessee at the time of the acquisition or became a lessee after the acquisition of the development tract, who has applied to the authority and has qualified for purchase of the leased fee interest shall purchase from the [HHA] by contract within sixty days of acquisition of the interest by the [HHA] * * * [Haw. Rev. Stat. sec. 516-30 (1985).]

Petitioners also rely on the stipulated testimony of Kazuo Kohatsu (Kohatsu), the land reform administrator of the HHA from 1969 through 1984, that the HHA required participating lessees to comply with the requirements of the HLRA, which included securing lessees' written commitment to acquire the leased fees upon their acquisition by the HHA.

The HLRA, however, also provides that the HHA is required to reimburse the fee owner for actual expenses and attorney fees incurred if the HHA does not acquire through voluntary action, or commence condemnation proceedings to acquire, the owner's fee interests within 12 months after the HHA designates the development tract for acquisition. Haw. Rev. Stat. sec. 516-23 (1985). In turn, the application to purchase and the request for designation provided that lessees who withdrew their applications to purchase the leased fee interests from the HHA after the HHA has designated their leased fees for acquisition, but prior to acquisition by the HHA, must pay to the HHA their pro rata share of the HHA's costs for the designation and acquisition efforts and any amounts that the HHA is required by law to reimburse to the leased fee owner.

In addition, petitioners and the lessees who executed and submitted to the HHA the request for designation were also obligated to pay to the HHA their "pro-rata share of all [acquisition] costs incurred by the [HHA]" in the event that the HHA acquired a fee interest but the particular lessee failed or refused "to enter into a contract to purchase the leased fee interest within sixty (60) days of the acquisition" by the HHA. Acquisition costs included appraisal, publication, and survey costs. See Haw. Rev. Stat. sec. 516-30 (1985). The terms of the settlement and of the estate's offer

to sell similarly obligated petitioners to pay their pro rata share of the estate's litigation costs and expenses incurred in the Kahala Beach action and their pro rata share of the HHA's costs if they did not accept the estate's offer to sell. Those total costs were $7,253.89.

In the event that petitioners withdrew their application, or elected not to purchase, they were required to reimburse the HHA and the estate for costs and expenses incurred and the ownership in the leased fee interest would remain with the estate. That obligation, however, was not an " 'indebtedness' within the meaning of section [163(a)]," *Deputy v. du Pont*, 308 U.S. at 497, and, in any event, was not the indebtedness upon which the disputed payment was computed.

The indebtedness upon which petitioners paid the disputed amount was not an unconditional and legally enforceable obligation as of January 23, 1981, the date that petitioners' lot was designated for acquisition. Petitioners were not unconditionally obligated to pay "just compensation" *to the estate* until they affirmatively executed the reply to the estate's offer to sell, indicating their intent to purchase the lot, and escrow closed on the purchase. That is, petitioners were not obligated for the payment of a principal sum until the date that escrow closed on the purchase.

Petitioners contend that, even if the purported indebtedness was not unconditional until the date of closing, "the cases are clear that it still represented a sufficient obligation upon which deductible interest could ultimately accrue." Respondent contests this proposition and its applicability to the facts and circumstances of petitioners' purchase in this case.

Petitioners rely primarily on the standard articulated in *Dunlap v. Commissioner*, 74 T.C. 1377 (1980), revd. on other grounds 670 F.2d 785 (8th Cir. 1982). In *Dunlap*, the taxpayer-corporation entered into an agreement on July 1, 1971, to purchase the stock of a savings bank from two of its shareholders. A portion of the base purchase price took the form of three promissory notes bearing interest at 9½ percent, from July 1, 1971. The agreement was subject to the prior approval of the Board of Governors of the Federal

Reserve System (F.R.B.). The F.R.B. approved the agreement, and the deal closed on July 12, 1972. On that date, the taxpayer paid to the selling shareholders an amount designated interest from July 1, 1971, through June 30, 1972, at 9½ percent on the principal amount of the notes.

To determine whether the payment was deductible by the taxpayer as interest within the meaning of section 163(a), we stated:

> Analysis of this issue requires us first to determine whether the amounts in question were *intended* by the parties to constitute interest. Secondly, if so, we must decide whether the law will give effect to such intention where the interest relates to periods prior to the existence of an unconditional obligation. * * * [*Dunlap v. Commissioner*, 74 T.C. at 1421; emphasis in original.]

Having concluded that an indebtedness to the estate did not arise until the date of closing, we address first the second prong of the standard established in *Dunlap.*

In *Dunlap,* respondent contended that, because the debt was only conditional until F.R.B. approval was granted, the taxpayer could not deduct the amount paid for the period prior to approval as interest under section 163(a); we decided that, at the time of closing, an indebtedness existed in the principal amount of the notes and that therefore:

> The issue posed is whether the fact that the indebtedness was materially conditional during the period of "interest accrual" precludes the deduction of "interest" paid with respect to such period after the debt became unconditional. [74 T.C. at 1423.]

We held that the preissue interest was deductible by the taxpayer. We distinguished the case of *Williams v. Commissioner,* 47 T.C. 689 (1967), affd. 409 F.2d 1361 (6th Cir. 1968), and instead relied on a particular line of cases that allowed the deduction of interest that accrued during the time that an obligation was conditional. The following discussion from *Dunlap* pertains to those cases:

> Far closer to the facts before us is our more recent opinion, *Monon Railroad v. Commissioner,* 55 T.C. 345 (1970). The petitioner in this case was a railroad corporation. On March 31, 1958, petitioner issued to its class A stockholders, in exchange for their stock, shares of class B stock plus 6-percent income debentures bearing preissue "interest" from January 1, 1957. Respondent disallowed petitioner's deduction of the preissue interest on the dual grounds that the debentures were really

"equity" and that even if they were debt, there was no debt before March 31, 1958, so that interest for the prior 15 months would be nondeductible.

We held that the debentures were debt and allowed the preissue interest deduction. In so doing, we relied heavily on *Commissioner v. Philadelphia Transportation Co.*, 338 U.S. 883 (1949), affg. per curiam 174 F.2d 255 (3d Cir. 1949), affg. 9 T.C. 1018 (1947). We construed the Supreme Court's per curiam affirmance of the opinion of the Court of Appeals for the Third Circuit in that case as inferentially overruling the contrary holding of *Commissioner v. Drovers Journal Pub. Co.*, 135 F.2d 276 (7th Cir. 1943), reversing a Memorandum Opinion of this Court.

We see no logical distinction between our case and *Monon Railroad.* In fact, justifying treatment of preissue "interest" as interest in our case is easier, for in *Monon Railroad,* preissue interest relating to periods before even a *conditional* obligation existed was held deductible, whereas in our case, the interest accrual date of July 1, 1971, coincided with the date of the 1971 purchase agreement, creating at least a conditional debt. * * *

[74 T.C. at 1423-1424.]

In *Journal Co. v. Commissioner,* 125 F.2d 349 (7th Cir. 1942), revg. 44 B.T.A. 460 (1941), another case relied on by petitioners, a deduction was allowed for interest that accrued from the date of the agreement to the date of the delivery of the stock. That agreement was a binding contract and the purchase price of the stock was fixed as of the date of the agreement; that agreement, however, specifically provided that the sale was subject to the approval of a State probate court. 125 F.2d at 350.

In this case, petitioners had the opportunity to choose not to purchase the leased fee interest in their lot at any time up to, and until, the date of closing. Thus, whether petitioners' obligation to purchase the leased fee interest became unconditional was wholly within the control of *petitioners.* This is a significant distinction from *Dunlap v. Commissioner, supra,* and *Journal Co. v. Commissioner, supra,* where the agreements were subject to the approval of the F.R.B. and a State probate court, respectively, and in each instance without the control of the taxpayer.

Furthermore, the amount of the indebtedness upon which interest accrued in *Dunlap v. Commissioner, supra,* and *Journal Co. v. Commissioner, supra,* was fixed as of the date that the interest began to accrue. In the instant case, the amount of the indebtedness was not determined by the jury

until nearly 6 years after petitioners' conditional obligation to purchase arose.

Another consideration that serves to distinguish this case from other cases that have allowed interest to be deducted prior to the time that the obligation was unconditional emanates from the nature of the relationship of the parties to the relevant agreement, the payor, and the payee. The payor's liability at the time of payment must be primary and direct. *Smith v. Commissioner,* 84 T.C. 889, 897 (1985), affd. without published opinion 805 F.2d 1073 (D.C. Cir. 1986). "Only interest accruing when the taxpayer is primarily liable on a debt is treated as 'interest on indebtedness.'" *Arrigoni v. Commissioner,* 73 T.C. 792, 806 (1980). In *Smith,* we stated that to be interest "on indebtedness":

the payment must be made pursuant to an agreement providing either for the use of money by the payor or for the forbearance of enforcement of a money obligation of the payor. [84 T.C. at 897; fn. ref. omitted.]

Typically, that standard is applied to determine whether the indebtedness is that of the taxpayer as required by section 163(a), or, alternatively, the indebtedness of a third party paid by the taxpayer.

In *Dunlap v. Commissioner, supra,* and *Journal Co. v. Commissioner, supra,* the liability of the taxpayer arose out of the respective sale agreements and ran directly to the payee-seller from the date that the taxpayer's obligation became conditional and interest began to accrue on that obligation; further, payment was made pursuant to an agreement providing for the use of money *of the payee* by the payor.

In this case, at the time of payment, petitioners' liability was to the estate. Petitioners' conditional obligation, upon which interest accrued, was to purchase the leased fee interest; that obligation, however, was to purchase *from the HHA* the leased fee interest that the HHA acquired. Prior to the time that petitioners settled the Kahala Beach action, executed the reply to proposal, and escrow closed, no direct and primary liability ran from the payor, petitioners, to the payee, the estate, during the time that at least a portion of the purported interest accrued on the conditional obligation to purchase. The facts are therefore unlike those in *Dunlap*

*v. Commissioner, supra,* and *Journal Co. v. Commissioner, supra,* where the conditional debt from the payor to the payee arose as of the date that the agreement between the parties was executed and interest began to accrue. Whatever the relation between petitioners and the estate may have been prior to the date of closing, petitioners were not indebted to the estate. See *Bettendorf v. Commissioner,* 3 B.T.A. 378, 384 (1926).

The facts in the instant case are also distinct from the facts in the principal cases from which we derived support for our holding in *Dunlap v. Commissioner, supra.* Those cases, *Commissioner v. Philadelphia Transportation Co.,* 338 U.S. 883 (1949), affg. per curiam 174 F.2d 255 (3d Cir. 1949), affg. 9 T.C. 1018 (1947); *Commissioner v. Columbia River Paper Mills,* 126 F.2d 1009 (9th Cir. 1942), affg. 43 B.T.A. 104 (1940); and *Monon Railroad v. Commissioner,* 55 T.C. 345 (1970), are discussed below.

In *Commissioner v. Columbia River Paper Mills, supra,* the taxpayer-corporation, by offer dated August 1, 1937, offered to exchange for shares of its preferred stock 30-year income bonds dated July 1, 1937, to bear interest at the rate of 5 percent per annum. The exchanges were made between August 1, 1937, and December 31, 1937. Petitioner claimed an interest expense deduction under the statutory predecessor of section 163(a); respondent disallowed the deduction to the extent it represented interest accrued on the bonds prior to their issue date. The Court of Appeals for the Ninth Circuit allowed the deduction and stated that:

It was plainly the intent of the taxpayer and those of its preferred stockholders who exchanged their stock for bonds that interest at the designated rate was to be paid on the principal of the bonds from July 1, 1937, to the date of maturity * * * . The arrangement was a logical one under the circumstances, but even if it were not the fact is of no importance. * * * In short, the situation is one where the parties to the transaction, being free to contract, have agreed on the one hand to pay, and on the other hand to accept, a definitely ascertainable sum as compensation for the use of money over a stated period of time. [*Commissioner v. Columbia River Paper Mills,* 126 F.2d at 1010.]

In *Commissioner v. Philadelphia Transportation Co., supra,* the taxpayer-corporation issued, in January 1940, in accordance with a reorganization plan, mortgage bonds dated January 1, 1939, and bearing interest from that date.

The interest coupons for 1939 and 1940 were redeemed by the taxpayer in 1940; the taxpayer claimed an interest expense deduction for that year. 174 F.2d at 255. Concluding that the interest accrued and was deductible in 1940, the first year that the corporation was in existence, the Court of Appeals for the Third Circuit stated that "the situation is the same as if the 1940 interest coupons were just double the later ones in amount." 174 F.2d at 256.

Finally, in *Monon Railroad v. Commissioner, supra,* this Court reached the same conclusion on comparable facts. We therefore concluded that, as in *Commissioner v. Philadelphia Transportation Co., supra,* "the situation we have here is the same as if the [taxpayer] had provided for the payment of a higher rate of interest for the first 9 months of the debentures." *Monon Railroad v. Commissioner,* 55 T.C. at 362.

Thus, in all three of the cases discussed above, "preissue interest relating to periods before even a *conditional* obligation existed was held deductible." *Dunlap v. Commissioner,* 74 T.C. at 1424. The principle that formed the basis upon which these cases were decided, however, does not extend to the instant case. In each case, it was determined that the taxpayer could have accomplished the same result by providing a higher rate of interest on the particular debt instruments in the year issued; in any event, the indebtedness was fixed as of the date of the agreement and the interest deduction would have been the same. Only the rate of interest would have changed. Thus, the interest was *calculated* based upon a period prior to issuance; this was immaterial where the parties could have provided a higher rate of interest for the period *after* the obligation upon which interest was calculated rose to the level of indebtedness and the interest accrued or was paid.

In the instant case, the asserted purpose of the disputed "interest" amount was to compensate the estate for delay in payment from the date of designation to the date of closing; that "interest" related solely to the period prior to the date of closing. Thus, the situation is not one where petitioners could have provided for a higher rate of interest for the period after the obligation rose to the level of an indebtedness within the meaning of section 163(a); on that

date, they simultaneously extinguished the entire indebtedness. Rather, given this fact, the situation is analogous to the facts in *Titcher v. Commissioner*, 57 T.C. 315, 322 (1971). In *Titcher*, the purchaser of a parcel of land paid $100,000 to the seller as "prepaid interest" in December 1964, the year in issue; at that time, the purchaser also deposited with the escrow agent an unsecured promissory note payable to the seller for the remaining balance of the purchase price. We determined that the $100,000 was not interest paid on indebtedness. Until the sale was consummated and the note was delivered to the seller at closing, there was no existing indebtedness running to the seller. Further, the balance of the purchase price was to be paid in cash at the time of closing. We therefore concluded that:

Thus, the note was to be fully discharged at the moment it was scheduled to be handed over to the seller. There was plainly not even a split second in time when it was contemplated that the purchaser would be obligated to pay the principal amount of the note and when bona fide interest could accrue thereon. [*Titcher v. Commissioner*, 57 T.C at 322.]

In *Williams v. Commissioner*, 47 T.C. 689 (1967), affd. 409 F.2d 1361 (6th Cir. 1968), the taxpayer acquired a life insurance policy in 1949. The policy lapsed as of July 1, 1951, for nonpayment of premiums. In 1961, the taxpayer deducted as interest amounts paid in that year to reinstate the policy. Those amounts were paid in accordance with the reinstatement provisions of the policy and were denominated "interest" on unpaid monthly premiums from the date the policy lapsed to the date of reinstatement and interest on a loan under the policy. 47 T.C at 690-691. We held that the payments were not deductible as interest; the payments did not represent "interest on indebtedness" because:

During the period from lapse to reinstatement, petitioner did not have the use of any of the insurance company's money, nor did the company forbear the collection of any money due it; petitioner had no coverage and owed nothing. * * * The fact that a percentage was used in the computation and that it may have been designated "interest" does not avoid this conclusion. The payment was necessitated solely by *petitioner's election* to reinstate the policy in October 1961. [*Williams v. Commissioner*, 47 T.C. at 692; fn. ref. omitted; emphasis supplied.]

Thus, the choice of whether to reinstate the policy was wholly within the control of the taxpayer at all times. Similarly, in this case, the election to purchase the leased fee interest was wholly within the control of petitioners at all times. See also *Howlett v. Commissioner*, 56 T.C. 951, 960-961 (1971). In *Williams v. Commissioner, supra*, and in the instant case, an unconditional enforceable obligation for a principal sum did not exist during the period that interest accrued.

We believe that the facts in the instant case are more analogous to the facts in *Williams* than to the facts in *Dunlap v. Commissioner, supra*, and to those in the cases that we relied on in *Dunlap*. Accordingly, and for the additional reasons set forth above, we conclude that petitioners are not entitled to the claimed interest deduction in the instant case.

We arrive at such a conclusion in this case not based on any one isolated factor, but, rather, based on all of the factors discussed above and an examination of the substance of the transaction as a whole in light of these relevant factors. The general rule of section 163(a) is that interest is deductible only if paid on an existing unconditional obligation. The cases discussed above illustrate that, given a particular set of circumstances, a deduction will be allowed where interest accrued during a time that the obligation was materially conditional. This case, however, does not present such circumstances. Petitioners' conditional obligation was to purchase from the HHA the leased fee interest that the HHA acquired from the estate. Under the HLRA, if the HHA acquired the leased fee interest and petitioners thereafter refused to purchase the interest from the HHA, they were only liable for certain incidental costs incurred.

Under the terms of the settlement in this case, petitioners were not primarily and directly liable to pay to the estate the amount upon which "interest" was calculated until the date of closing; that amount was not determined as of the date that the "interest" began to accrue. Further, whether petitioners' unconditional obligation to the estate arose was wholly within petitioners' control; if petitioners elected not to purchase the leased fee interest from the estate, they

were required only to pay certain costs incurred to that point and the estate retained the ownership to the leased fee interest.

## Blight of Summons Damages

The disputed payment in this case represented blight of summons damages under Hawaii law. In Hawaii, blight of summons damages are paid "to compensate a condemnee for the loss of use of the cash equivalent of the taken property." *City and County of Honolulu v. Market Place, Ltd.,* 55 Haw. 226, 517 P. 2d 7, 16 (1973). In *Kieselbach v. Commissioner,* 317 U.S. 399, 403-404 (1943), the Supreme Court explained that payments above the value of the condemned property as of the date of taking in a condemnation action are "paid because of the failure to put the award in the taxpayers' hands on the day * * * when the property was taken" and thus "are indemnification for delay, not a part of the sale price."

Petitioners argue that our decision in *Ferreira v. Commissioner,* 57 T.C. 866 (1972), "as well as the Hawaii decisions relied upon in *Ferreira,* clearly evidence that blight of summons damages are economically interest for federal tax purposes, even though they may be construed as a component of just compensation under state law." Petitioners therefore argue that, "if the tax laws are to be applied at all consistently, those amounts must be deductible as interest." In *Ferreira,* we drew upon the following excerpt from the Hawaii Supreme Court's opinion in *In re Campbell's Estate,* 46 Haw. 475, 382 P. 2d 920, 969 (1963), where that court explained that:

Blight of summons damages are paid because the property "is presumed to be taken as of the date of summons and its value is calculated as of that date." Since payment is not made on that date, in order to compensate therefor the condemning authority must pay interest, subject to a setoff for rents received, so as to put the property owner in the same position as if payment had been made contemporaneously with the summons. * * * [*Ferreira v. Commissioner,* 57 T.C. at 871.]

We concluded that the payment made to the taxpayers whose property had been taken by condemnation "was made to compensate [the taxpayers] for the delay between

the taking of their property and the final compensating award made 6 years later" and was not part of the sale price. *Ferreira v. Commissioner,* 57 T.C. at 872. Thus, the payment was taxable as ordinary income under section 61(a).

In *Hawaii Housing Authority v. Midkiff,* 69 Haw. 247, 739 P. 2d 248 (1987), the Hawaii Supreme Court addressed the issue of the amount, and calculation, of blight of summons damages to be awarded in a leasehold condemnation action under the HLRA. The issue for decision was "whether blight of summons damages, which were fixed, as a matter of law, by the judge below, at five per cent, should have been awarded at all, and, if so, at what rate." 739 P. 2d at 249. As to the first issue, the court held that blight of summons damages are required in an action under the HLRA to insure "that just compensation be paid." 739 P. 2d at 250 n.1.

As to the second issue, the court concluded that the lower court's determination that blight of summons damages are limited as a matter of law to 5 percent was incorrect. The court's conclusion was premised on a perceived lack of statutory provisions, either substantive or procedural, that apply in determining blight of summons damages in a leasehold condemnation action. The court stated that:

we must, perforce, fill in those lacunae, and fashion a workable procedure for determining blight of summons damages in such cases. The proper amount of blight of summons damages, to effect just compensation in any case, is a matter of fact. Both interest rates and changes in the value of the property taken are relevant thereto but neither is binding as a matter of law * * * . There are, at any given time, numerous rates of interest available in the market depending on various factors including, but not limited to: the type of investment, the term of the investment, the type, if any, of security involved, and others. Moreover, all these rates may vary greatly during the period that an eminent domain case is pending. The rate of increase, or decrease, in the fee simple value of property condemned may also fluctuate wildly during such period. Determining blight of summons damages in any case will be difficult for the trial judge but no mechanistic formula will produce just compensation in all cases.

On remand, the court below should hold an evidentiary hearing and allow the parties to present any competent evidence, of matters not merely speculative, which would bear on the amount of blight of summons damages to be fixed as a part of just compensation, and then, considering that evidence, together with all the facts and circumstances

of the case, make a finding of fact as to the amount of such damages, expressed as a rate of interest, which will, in this particular case, effect an award of just compensation. From that amount, the rentals received by the lessors in the interim period from the valuation date to judgment must, of course, be deducted.

[*Hawaii Housing Authority v. Midkiff*, 739 P. 2d at 251.]

Respondent contends that, because changes in the value of the condemned property are relevant, blight of summons damages are other than, and distinguishable from, interest.

We are not required to conclude, as petitioners contend, that the payment is interest within the meaning of section 163(a) merely because we held in *Ferreira v. Commissioner, supra,* that a similarly identified amount was includable in income to the recipient. The inclusion of an item in the income of the payee does not guarantee that the item is deductible by the payor. Deductions are a matter of legislative grace, and petitioners are required to show that the claimed deduction is within the scope of the particular statutory provision allowing that deduction. *New Colonial Ice Co. v. Helvering*, 292 U.S. 435, 440 (1934). The amount in dispute is only deductible under section 163(a) if it is paid on indebtedness.

An HLRA leasehold condemnation action differs from a typical condemnation action in several respects. As respondent points out, in this case:

Unlike most normal condemnation actions, where the government dispossesses the owner from the incidents of ownership of the condemned property upon the initiation of the condemnation action, nothing really changed during the five years between the filing of the complaint and petitioners' acquisition of the fee simple interest in their residential leasehold. Estate continued to receive its lease rent under the long-term lease and petitioners continued to reside in their house. * * *

Petitioners on the other hand argue that:

the fundamental relationship of Petitioners and the Estate *did* substantially change at Designation, with Petitioners thereafter the presumptive owners of the Estate's former leased fee, entitled to any and all future appreciation and exposed to any and all future depreciation in value. Again, clear corroboration of this changed relationship was the determination that [the estate] thereafter was no longer entitled to lease rents.

We cannot agree with petitioners' arguments.

First, petitioners have failed to cite any authority directly in point that supports their assertion that they were the "presumptive owners" as of the date of taking. Rather, petitioners rely on general principles of Hawaii general condemnation law to argue that they were required to compensate the estate at the date of designation and, hence, were entitled to the benefits associated with the leased fee interest from that date forward. We have addressed this argument in rejecting petitioners' contention that an unconditional obligation arose as of the date of designation. Moreover, even though the stipulated testimony was that the HHA merely serves as the "facilitator" in HLRA condemnation actions, the HLRA contemplates that the *HHA* acquires "all of the right, title, and interest of the fee owner" upon acquisition of the leased fee interest. Haw. Rev. Stat. sec. 516-25(a) (1985). Petitioners' agreement to purchase from the HHA any interest acquired by the HHA does not transform petitioners' status to "presumptive" or equitable owners as of the date of designation as petitioners contend.

Second, petitioners' assertion that the estate was not entitled to lease rent as of the date of designation is unpersuasive. Petitioners continued to pay lease rent to the estate under the terms of the lease; further, the Hawaii Supreme Court in *Hawaii Housing Authority v. Midkiff, supra,* held that the rentals received by the lessors in the interim period from the valuation date to judgment are deducted *from* the amount of the blight of summons damages, although blight of summons damages are necessary to give the lessor "just compensation." The estate was entitled to and did receive the lease rent payments from the valuation date to the date of closing and would have continued to receive them if closing had not occurred.

This interrelationship of the lease rent payments and the amount petitioners paid as blight of summons damages in the context of a leasehold condemnation action is significant. Petitioners' obligation to pay the lease rent arose under the terms of the lease and was not dependent on their subsequent election to purchase. Those payments gave petitioners the continued right to possession of the property; this distinguishes the instant case from the typical

condemnation action where, as of a date certain, the condemning authority technically takes title to, and possession of, the condemned property. As of that date, the condemnee is dispossessed and deprived of the future appreciation and other benefits associated with the property. Hence, the condemnee receives payment for the delay in the receipt of the value determined as of that same date. See *Kieselbach v. Commissioner,* 317 U.S. 399, 401 (1943); *Smith v. Commissioner,* 59 T.C. 107, 111-112 (1972).

Petitioners assert:

from and after the valuation date, the Estate was deprived of investment potential, possibility of future development, possibility of appreciation, and beneficial use of the condemned property.

The estate, however, was similarly deprived during the term of the lease. The rent specified in the lease was the agreed and unconditional payment for petitioners' possession of the property prior to the transfer of title and was not compensation for the delay in the receipt of funds.

Given these facts and the nature of blight of summons damages in an HLRA condemnation action, we do not believe that this amount was paid solely to compensate the estate for delay in the receipt of funds. Petitioners did not have the use of any money of the estate during the period of interest accrual and the estate did not forbear the collection of any money due it from petitioners during this period. Rather, no money was due until petitioners executed the reply to proposal and escrow closed.

Because of our conclusion, we do not reach the other requirements of section 163(a). To reflect the foregoing,

*Decision will be entered for the respondent.*