T.C. Memo. 2003-101

UNITED STATES TAX COURT

INDECK ENERGY SERVICES, INC., AND SUBSIDIARIES, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

MICHAEL P. AND MAYA POLSKY, Petitioners <u>v</u>.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket Nos. 21586-97, 23943-97.    Filed April 11, 2003.


<u>Thomas C. Borders</u>, <u>James L. Malone III</u>, and <u>David J. Duez</u>,
for petitioners Indeck Energy Services, Inc., and Subsidiaries.

<u>Ronald A. Stein</u>, for petitioners Michael P. and Maya Polsky.

<u>Jan E. Lamartine</u> and <u>Robert Little</u>, for respondent.

MEMORANDUM FINDINGS OF FACT AND OPINION

GALE, Judge:  By separate notices of deficiency, respondent determined the following deficiencies and penalties with respect to petitioners' Federal income taxes:

Indeck Energy Services, Inc. and Subsidiaries
docket No. 21586-97

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|------------|----------------------|
| FYE 11/30/93 | $1,542,339 | $231,108 |
| FYE 11/30/94 | 4,994,929 | 999,468 |
| FYE 11/30/95 | 536,715 | 107,343 |

Michael P. and Maya Polsky
docket No. 23943-97

| Year | Deficiency | Penalty Sec. 6662(a) |
|------|------------|----------------------|
| CY 1994 | $660,910 | $132,182 |

These cases were consolidated for trial, briefing, and opinion.  After concessions, we must decide the following issues:

(1)  Whether $4,856,922 of a $19,886,922 settlement payment made by petitioner Indeck Energy Services, Inc. (Indeck), to petitioner Michael P. Polsky (Mr. Polsky) on May 16, 1994, constitutes interest deductible by Indeck and recognizable as ordinary income by petitioners Michael P. and Maya Polsky in their respective taxable years ended in 1994, or instead is part of the purchase price for shares of Indeck stock sold by Mr. Polsky to Indeck; and

(2) Whether petitioners Indeck Energy Services, Inc., and Subsidiaries or petitioners Michael P. and Maya Polsky are liable for accuracy-related penalties under section 6662(a) for their respective taxable years ended in 1994.

Unless otherwise indicated, all section references are to the Internal Revenue Code in effect for the years in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure.

## FINDINGS OF FACT

### Background

Some of the facts have been stipulated and are so found. The stipulation of facts and first supplemental stipulation of facts, together with the exhibits attached thereto, are incorporated herein by this reference.

Petitioners Michael P. and Maya Polsky (the Polskys) resided in Northbrook, Illinois, at the time their petition was filed.

Indeck is the common parent of an affiliated group of corporations making a consolidated return. Indeck's principal office was located in Buffalo Grove, Illinois, at the time its petition was filed.

Prior to and during the year in issue, Indeck was engaged in the power supply business, principally through cogeneration, the simultaneous generation of electricity and another form of useful thermal energy, such as steam, from the same fuel source.

Mr. Polsky was hired to serve as president of the Indeck Energy Services Division of Indeck Power Equipment Co. (Indeck Power) in June 1985 by Indeck Power's president, Gerald R. Forsythe. Indeck Power's Indeck Energy Services Division was subsequently incorporated as petitioner Indeck in 1985. Mr. Polsky became its president in 1986.

Agreements Covering Employment and Purchase/Sale of Indeck Stock

On January 21, 1987, Mr. Polsky and Indeck executed an employment agreement (Employment Agreement) and a shareholders' agreement (Shareholders' Agreement),[1] both retroactive to June 1, 1986. The Employment Agreement provided that Indeck would employ Mr. Polsky for 7 years; i.e., until June 1, 1993. The Employment Agreement further conferred upon Mr. Polsky salary, bonuses, and additional compensation measured as a percentage of Indeck's net profits, as well as certain stock options and deferred compensation rights that entitled him to acquire up to 30 percent of Indeck's outstanding shares of common stock. The Shareholders' Agreement restricted the sale of any Indeck shares acquired by Mr. Polsky, providing in general that Mr. Polsky was required to sell, and Indeck to purchase, such shares in the event that Mr. Polsky's employment with Indeck were terminated under prescribed conditions, including voluntary or involuntary

---

[1] Indeck Power was also a signatory to the Shareholders' Agreement.

termination during the 7-year term of employment provided in the Employment Agreement, and thereafter.

While the Employment Agreement provided for Mr. Polsky's employment by Indeck for 7 years until June 1, 1993, it further entitled Indeck in its sole discretion to terminate Mr. Polsky's employment after 4 years in prescribed circumstances.[2] Specifically, under paragraph 12.c. of the Employment Agreement, Indeck was entitled to terminate the agreement (with 30 days' notice) if, as of the fourth anniversary of the effective date of the agreement, Indeck had a negative net worth of $500,000 or more, as determined from its audited statements for the 4 previous fiscal years ended November 30, 1986, 1987, 1988, and 1989.

The Shareholders' Agreement, which incorporated and cross-referenced the Employment Agreement, provided that Mr. Polsky was required to sell, and Indeck required to purchase, any Indeck shares owned by Mr. Polsky in the event of the involuntary termination of his employment after 4 years pursuant to paragraph 12.c. of the Employment Agreement. The Shareholders' Agreement further provided that the price to be paid by Indeck in these circumstances was an amount equal to the greater of: (1) 100

---

[2] Under the Employment Agreement, Indeck could otherwise terminate Mr. Polsky's employment at any point during the 7-year term (with 30 days' notice) in the event he "[failed] or [refused] to faithfully or diligently perform the provisions of this Agreement."

percent of the net book value per share as of the last day of the month preceding the date of the notice of termination; or (2) the highest purchase price offered in all bona fide third-party offers to purchase 100 percent of Indeck's total voting stock received within 1 year from the date of employment termination. The Shareholders' Agreement further provided that the closing date for the purchase of Mr. Polsky's shares was to occur within 13 months of the date of termination, at which time Indeck was to pay Mr. Polsky 20 percent of the purchase price, with the remaining 80 percent to be paid equally over four annual installments with interest on the unpaid balance at a rate equal to the applicable Federal rate as defined in section 1274(d) (hereafter, the Federal funds rate). For purposes of setting the purchase price of Mr. Polsky's shares by means of third-party offers, the Shareholders' Agreement authorized Mr. Polsky to solicit offers to purchase Indeck's shares and required Indeck to provide "reasonable assistance" in connection with the solicitations.

The Employment Agreement provided that any controversy or claim arising out of the agreement was required to be settled by arbitration. The Shareholders' Agreement provided that, in addition to any other remedies available to the parties thereto, any controversy concerning the right or obligation to purchase or

sell Mr. Polsky's shares was enforceable in a court of equity by a decree of specific performance.

## Termination of Mr. Polsky

On August 2, 1990, Gerald R. Forsythe, Chairman of the Board of Indeck, notified Mr. Polsky by letter that his employment with Indeck would terminate on September 5, 1990, in accordance with paragraph 12.c. of the Employment Agreement, on the ground that Indeck's negative net worth exceeded $500,000 as of November 30, 1989. Shortly thereafter, Mr. Polsky and Mr. Forsythe met regarding the termination letter and the possibility of renegotiating the terms of Mr. Polsky's employment. When Mr. Polsky did not accede to terms of a new agreement, he received a letter on September 21, 1990, advising that his employment with Indeck would terminate on September 22, 1990. Mr. Polsky's employment with Indeck did terminate on that date. At that time, Mr. Polsky held 30 of Indeck's 100 issued and outstanding shares of common stock.

## Dispute Concerning Payment for Mr. Polsky's Indeck Stock

Mr. Polsky commenced an arbitration proceeding against Indeck on September 21, 1990. In the arbitration, Mr. Polsky sought an award of compensatory damages for breach of the Employment Agreement, including the amount he would have received in salary, bonuses, and percentage compensation, as well as the value to which his Indeck shares would have appreciated by June

1, 1993, the expiration of his term of employment under the Employment Agreement.

Mr. Polsky also began soliciting potential purchasers for Indeck's outstanding stock in an attempt to set a value for his shares under the third-party offer provisions of the Shareholders' Agreement. As a result of Mr. Polsky's efforts, on November 9, 1990, PowerLink Corp. (PowerLink), the subsidiary of a private utility holding company with assets of $2.5 billion, offered to purchase all 100 of Indeck's outstanding shares from its shareholders at a price of $1 million per share, subject to certain contingencies and a due diligence financial review. PowerLink revised its offer to $501,000 per share in a letter to Indeck received on January 31, 1991. After Indeck's board of directors reviewed PowerLink's offer, Mr. Forsythe wrote to PowerLink on February 6, 1991, stating that shareholders owning more than 50 percent of Indeck's outstanding common stock had advised the board that they were unwilling to sell their shares. On February 14, 1991, PowerLink advised Mr. Polsky by letter that its offer to purchase Indeck's outstanding shares had not been accepted and had expired.

As a result of further efforts by Mr. Polsky, CMS Generation Co. (CMS Generation), the subsidiary of a private utility company with $8 billion in assets, made an offer on August 6, 1991, to purchase the outstanding stock of Indeck for $75 million subject

to a due diligence financial review.  On September 24, 1991, Mr. Forsythe, acting on behalf of Indeck, advised CMS Generation by letter that Indeck's obligation to cooperate with Mr. Polsky under the Shareholders' Agreement had expired and that, as a shareholder, he was not interested in selling his shares of Indeck stock.

Proceedings in the arbitration action brought by Mr. Polsky had commenced in January 1991 and continued until May 1991.  Mr. Polsky filed a post-arbitration brief in June 1991 in which he contended that Indeck owed him the value of his shares as of the June 1, 1993, expiration of his employment term under the Employment Agreement.  Mr. Polsky further contended that the shares would have appreciated to a present value of $56.3 million at that time, due to anticipated revenues from existing cogeneration contracts held by Indeck.  Alternatively, Mr. Polsky argued that the January 31, 1991, PowerLink offer of $501,000 per share set a floor but not a ceiling on the damages to which he was entitled with respect to his Indeck stock.  (The August 6, 1991, CMS Generation offer of $75 million (or $750,000 per share) was not presented to the arbitrator.)  In response, Indeck argued that the arbitrator lacked jurisdiction with respect to the value or sale of Mr. Polsky's shares.

At a meeting in February 1991, Indeck's board of directors was advised by company counsel that if Mr. Polsky's termination

were found to be wrongful, he had no obligation to sell his shares to Indeck until the June 1, 1993, expiration of his term of employment under the Employment Agreement.

While the arbitrator's decision was pending, Indeck by letter dated October 1, 1991, advised Mr. Polsky of Indeck's position that, for purposes of the Shareholders' Agreement's terms governing the purchase price payable for Mr. Polsky's shares, no bona fide offers for Indeck's stock had been received within the requisite 1-year period following the termination of his employment. Consequently, Indeck advised, under the Shareholders' Agreement, Mr. Polsky was deemed to have offered, and Indeck was entitled to purchase, Mr. Polsky's Indeck shares for a purchase price determined under the "net book value" method provided in the Shareholders' Agreement. Indeck further took the position that the purchase price under that method was zero, in light of the negative book value of Indeck's shares as of August 31, 1990.

On November 27, 1991, the arbitrator issued an award in which he concluded that the termination of Mr. Polsky was in violation of the terms of the Employment Agreement and awarded Mr. Polsky $21,668,800 plus interest thereon at 10-percent per annum accruing from January 31, 1991, until paid. The award provided that the foregoing sum included "damages and the value of thirty (30) shares of the common stock of INDECK owned by

POLSKY." Although the arbitration award did not allocate the money damages between the damages for Indeck's breach of the Employment Agreement and the value of Mr. Polsky's 30 shares, it elsewhere provided that seven additional shares of Indeck stock, with respect to which Mr. Polsky's claim of ownership was disputed, had a value of $501,000 per share. The January 31, 1991, date on which interest began to accrue under the arbitrator's award was the date on which Indeck had received the PowerLink offer, and the per share value assigned by the arbitrator to the seven disputed Indeck shares was the price offered by PowerLink.

On December 3, 1991, Mr. Polsky brought an action seeking confirmation of the arbitration award and entry of judgment thereon in the Circuit Court of Cook County, Illinois (Cook County Lawsuit). Indeck's filing in response sought to have the arbitration award vacated insofar as it required a payment of $15,030,000 ($501,000 per share) for Mr. Polsky's 30 shares of Indeck stock, on the grounds that the arbitrator lacked jurisdiction over that issue.[3] Indeck did not contest the portion of the award relating to amounts Indeck owed Mr. Polsky

---

[3] In the alternative, Indeck sought to vacate the arbitration award insofar as it required immediate payment of the $15,030,000 value assigned to Mr. Polsky's shares, plus interest at 10 percent from Jan. 31, 1991, rather than imposing the Shareholders' Agreement's terms permitting payment for Mr. Polsky's shares in five installments with interest at the Federal funds rate.

for salary, bonus, and lost percentage compensation (which Indeck computed as $6,638,800).

On February 20, 1992, the Cook County Circuit Court issued an order vacating the arbitration award insofar as it awarded $15,030,000 to Mr. Polsky with respect to his 30 shares of Indeck stock, based on the court's conclusion that the arbitrator exceeded his jurisdiction in making an award with respect to the stock. The order confirmed the arbitration award insofar as it awarded damages based on the Employment Agreement, and entered judgment in favor of Mr. Polsky and against Indeck in the amount of $6,638,800, plus interest at 10-percent per annum on that amount until paid.

Indeck paid Mr. Polsky $7,301,005.80 on February 28, 1992, in satisfaction of the judgment entered in the Cook County Lawsuit. Mr. Polsky appealed the order in the Cook County Lawsuit insofar as it vacated the arbitration award and Indeck cross-appealed.[4] These appeals remained pending during the ensuing 2 years in which Mr. Polsky pursued a different lawsuit against Indeck in the Circuit Court of Lake County, Illinois (Lake County Lawsuit).

The Lake County Lawsuit, commenced by Mr. Polsky on April 20, 1992, against Indeck and certain company directors

---

[4] Indeck did not appeal the confirmation of that portion of the arbitration award that found its termination of Mr. Polsky to be in violation of the Employment Agreement.

individually, including Mr. Forsythe, sought damages for breach of the Employment Agreement and Shareholders' Agreement as well as for tortious interference with contract and with prospective economic advantage. In his complaint, Mr. Polsky again alleged that he was entitled to receive as damages the value to which his Indeck shares would have appreciated by June 1, 1993, the expiration of his term of employment under the Employment Agreement, which damages he alleged were not less than $55 million. The complaint also alleged certain new theories of recovery not advanced in the arbitration proceedings. These new theories incorporated the CMS Generation offer in addition to the PowerLink offer, and alleged that Mr. Polsky was entitled to damages measured by the higher of the two offers. The new grounds also included allegations that Indeck and/or its agents had refused to negotiate in good faith with PowerLink and CMS Generation, and had created or altered documents in order to misrepresent the value of Indeck's shares. The defendants made several counterclaims against Mr. Polsky, including claims that he breached the Employment and Shareholders' Agreements. Indeck's counsel believed that Indeck faced greater exposure in the Lake County Lawsuit than the Cook County Lawsuit.

Settlement of the Dispute

From the filing of the original complaint in April 1992 until early April 1994, discovery and various pretrial

proceedings were conducted in the Lake County Lawsuit.  Trial commenced on April 12, 1994.  Immediately following the first witness's testimony, the trial judge made the following observation to Indeck's trial counsel with respect to Indeck's obligation to give reasonable assistance under the Shareholders' Agreement to potential purchasers of its stock solicited by Mr. Polsky:

> I'm not sure that this isn't as a matter of law
> interference with the contract. * * *

>               *     *     *     *     *     *     *

> it just jumps out at the Court that this may well be
> failure to give reasonable assistance as a matter of
> law.   * * *

Based on the trial judge's comments, Indeck's trial counsel concluded that Indeck's strategy should be to seek settlement.  Indeck and Mr. Polsky's counsel commenced settlement discussions on that day, which continued on April 13.  On the afternoon of April 13, counsel for Indeck and Mr. Polsky appeared before the court to describe the basis for their settlement.  Indeck's counsel described the settlement's terms as requiring, inter alia, a payment by Indeck to Mr. Polsky of $10 million on or before May 15, 1994, followed by two additional payments of $5 million each on May 1, 1995 and 1996, respectively, with interest accruing at the Federal funds rate on the unpaid amounts.  The settlement was further described by Indeck's counsel as:

> [revolving] around the arbitration award that had been given to Mr. Polsky and is essentially looked at as a $15 million award with $5 million of interest that was figured at a 10 percent rate as required by the arbitrator.

>   *   *   *   *   *   *   *

>  * * * the settlement is basically a settlement of the arbitration and structured around the arbitration award and will include a dismissal of the pending appeal * * * [of the Cook County Lawsuit].

Mr. Polsky's counsel expressed agreement with the terms as outlined by Indeck's counsel, and the court issued an order that day dismissing the case with prejudice and retaining jurisdiction to enforce the settlement.

Written Settlement Agreement

Indeck's counsel served as draftsman for a written agreement to cover the terms of the settlement.  Successive versions of a written agreement were drafted or revised between April 21 and May 11, 1994.  A draft prepared by Indeck's counsel and submitted to Mr. Polsky's counsel on or before April 26, 1994, described the payment to be made for Mr. Polsky's 30 Indeck shares as follows:

> Indeck * * * agrees to purchase * * * the thirty (30) shares of * * * stock * * * for the price of * * * $501,000 per share, for a total purchase price of * * * $15,030,000, plus interest on the purchase price at Ten Percent (10%) from January 31, 1991 through April 13, 1994.  * * *

The draft further provided for payment of $10 million at closing with the remainder payable in two equal annual installments, with

interest on the unpaid portion to accrue at the Federal funds rate.  Tax counsel retained by Mr. Polsky reviewed this draft and suggested the elimination of the phrase "purchase price" as describing the $15,030,000 amount and of the term "interest" as describing the 10-percent amount.  Instead, the tax counsel recommended that both amounts be listed as components of the term "price".

Another draft prepared by Indeck's counsel and submitted to Mr. Polsky's counsel on May 5 or 6, 1994, described the payment as follows:

> Indeck * * * agrees to purchase * * * the thirty (30) shares of * * * stock * * * for a price computed as follows: (i) * * * $501,000 per share, for a purchase price of * * * $15,030,000 (the "Purchase Price"), and (ii) an amount determined by Ten Percent (10%) per annum on the purchase price of $15,030,000 from January 31, 1991 through April 13, 1994 (the "Interest").  * * *

As compared to the April 26 draft, this draft established "Purchase Price" and "Interest" as defined terms, and applied "Purchase Price" to the $15,030,000 amount (hereafter "Component (i)"), and "Interest" to the amount determined as 10-percent per annum thereon from January 31, 1991, through April 13, 1994 (hereafter "Component (ii)").  Like the April 26 draft, this draft also provided for a $10 million payment at closing and two equal annual installments of the balance on which interest would accrue at the Federal funds rate.  This draft also described the

combined dollar total of Components (i) and (ii) as the "total Purchase Price and Interest".

A later draft prepared by Indeck's counsel and submitted to Mr. Polsky's counsel on May 9, 1994, described the payment as follows:

> Indeck * * * agrees to purchase * * * the thirty (30) shares of * * * stock * * * for a price computed as follows: (i) * * * $501,000 per share, for a total of * * * $15,030,000 (the "Purchase Price"); plus (ii) an amount determined by Ten Percent (10%) per annum on the purchase price of $15,030,000 from January 31, 1991 through April 13, 1994 for a total of * * * $4,809,600; plus (iii) an amount determined by interest on the amount in (i) at * * * [the Federal funds rate] between April 14, 1994 and May 9, 1994, for a total of * * * $47,321.85.  The total Purchase Price and Interest of * * * $19,886,921.85 shall be paid * * * at the Closing.

As compared to the May 5/6 draft, this May 9 draft eliminated the defined term "Interest" as applicable to Component (ii) but the labeling of Component (i) as "Purchase Price" was preserved. This draft also eliminated the provision for installment payments of amounts over $10 million, calling instead for full payment at closing, with "interest" at the Federal funds rate accruing on Component (i) between April 14 and May 9, 1994, and such "interest" designated as a third component (hereafter "Component (iii)").  The combined dollar total of Components (i), (ii), and (iii) was described as the "total Purchase Price and Interest".

Mr. Polsky's counsel proposed the following edits to the description of the payment in the May 9 draft (additions underscored, strikeouts lined through):

> Indeck * * * agrees to purchase * * * the thirty (30) shares of * * * stock * * * for a price computed as follows ("Purchase Price"): (i) * * * $501,000 per share, for a total of * * * $15,030,000 (the "Purchase Price"); plus (ii) an amount determined by Ten Percent (10%) per annum on the purchase price of $15,030,000 the amount in (i) from January 31, 1991 through April 13, 1994 for a total of * * * $4,809,600; plus (iii) an amount determined by interest on the amount in (i) at * * * [the Federal funds rate] between April 14, 1994 and May 9 10, 1994, for a total of * * * $47,321.85. The total Purchase Price and Interest of * * * $19,886,921.85 shall be paid * * * at the Closing.

The changes proposed by Mr. Polsky thus eliminated any characterization of the $15,030,000 figure as purchase price, eliminated any characterization of the total settlement payment of $19,886,921.85 as including interest, and instead denominated the total of all components of the payment as purchase price. The foregoing changes proposed by Mr. Polsky were accepted by Indeck, with a minor exception.[5] The language of the executed settlement agreement (Settlement Agreement) described the payment as follows:

> Indeck * * * agrees to purchase * * * the thirty (30) shares of * * * stock * * * for a price computed as follows ("Purchase Price"): (i) * * * $501,000 per share, for a total of * * * $15,030,000; plus (ii) an amount determined by Ten Percent (10%) per annum on the

---

[5] The sole exception was Indeck's rejection of Mr. Polsky's proposal to change the end of the accrual period for Component (iii) from May 9 to May 10, 1994.

amount in (i) from January 31, 1991 through April 13, 1994 for a total of * * * $4,809,600; plus (iii) an amount determined by interest on the amount in (i) at * * * [the Federal funds rate] between April 14, 1994 and May 9, 1994, for a total of * * * $47,321.85. The total Purchase Price of * * * $19,886,921.85 shall be paid * * * at the Closing.

## Motion To Enforce Settlement

Prior to the execution of the Settlement Agreement, however, Mr. Polsky's counsel notified Indeck (on May 11, 1994) of his intent to present a motion to enforce settlement to the court in the Lake County Lawsuit. In the written motion, which contended that Indeck was improperly refusing to pay interest it had agreed to pay between April 13, 1994, and the closing date of the settlement, Mr. Polsky's counsel described the contemplated settlement payment by Indeck of $19,886,921.85 as "[representing] the total of the Arbitrator's value of the shares, the Arbitrator's award of interest on that value up to April 13, 1994 and interest on the Arbitrator's original value from April 14, 1994 to May 9, 1994 at the 'federal rate'."

On May 16, 1994, Mr. Polsky's counsel argued his motion, and the court ordered payment. Indeck and Mr. Polsky thereupon executed the Settlement Agreement, Indeck paid $19,886,921.85 to Mr. Polsky, and Mr. Polsky relinquished control over his 30 shares of Indeck.

Return Positions

On its return for the fiscal year ended November 30, 1994, Indeck claimed an interest expense deduction of $4,856,922; i.e., equal to the (rounded) total of Component (ii) ($4,809,600) and Component (iii) ($47,321.85) as described in the Settlement Agreement. The Polskys, on the other hand, reported the entire $19,886,922 settlement payment as proceeds from the sale of Mr. Polsky's Indeck shares on their 1994 return as amended. Indeck did not issue a Form 1099-INT, Interest Income, to Mr. Polsky with respect to any portion of the settlement payment made pursuant to the Settlement Agreement.

Notices of Deficiency

To prevent a "whipsaw" with respect to the proper tax treatment of the settlement payment, respondent issued inconsistent notices of deficiency to the petitioners herein.[6] In Indeck's notice, issued on August 13, 1997, after an examination, respondent determined that Indeck was not entitled to an interest deduction claimed with respect to $4,856,922[7] of

_____

[6] Respondent is entitled to defend against inconsistent results by issuing inconsistent determinations, see Maggie Mgmt. Co. v. Commissioner, 108 T.C. 430, 446 (1997), and each determination is entitled to the same presumption of correctness as if it had been issued separately, see Doggett v. Commissioner, 66 T.C. 101, 103 (1976); Ryan v. Commissioner, T.C. Memo. 1998-331.

[7] The notice of deficiency issued to Indeck disallowed an interest deduction of $4,856,921, while the notice issued to the
(continued...)

the settlement payment it paid.  In the Polskys' notice, respondent determined that $4,856,922 of the $19,866,922 settlement payment reported in the Polskys' 1994 return as long-term capital gain was instead interest income.  In both notices, respondent determined that the section 6662 accuracy-related penalty was applicable with respect to the taxable years ended in 1994.

OPINION

Indeck argues that the $19,886,922 settlement payment consisted of a $15,030,000 purchase price for Mr. Polsky's 30 Indeck shares and $4,856,922 in deductible interest, because both the parties' intent and the substance of the Settlement Agreement contemplated the payment of $4,856,922 as interest to compensate Mr. Polsky for the delay in receiving $15,030,000 for his shares after January 31, 1991.  Indeck further contends that the Polskys are estopped from denying that the $19,886,922 settlement payment includes interest under the doctrine of judicial estoppel.  The Polskys contend that the entire $19,886,922 settlement payment constitutes the purchase price for the shares, based on the express allocation of the entire amount to purchase price in the parties' written agreement, and the absence of any "indebtedness"

---

⁷(...continued)
Polskys recharacterized $4,856,922 of long-term capital gain as interest income.  Since the latter figure is the appropriate rounding of the actual $4,856,921.85 in dispute, we use the latter figure throughout this opinion.

within the meaning of section 163(a) on which to base a claim of interest. Respondent, after reviewing the evidence adduced at trial, has abandoned the stakeholder position assumed in the notices and now argues on brief in support of the Polskys' position and against Indeck's, on the grounds that the requisite "indebtedness" for purposes of an interest deduction under section 163(a) is lacking and that the substance of the parties' agreement did not include interest. For the reasons discussed below, we agree with the Polskys and respondent and hold that Indeck has failed to show entitlement to an interest deduction for any portion of the $19,886,922 payment it made to Mr. Polsky.[8]

Allocation in Written Agreement

Indeck argues that $4,856,922 of the settlement payment constitutes interest because Indeck and Mr. Polsky in substance agreed to an interest payment in that amount in settlement of their dispute. In support, Indeck points to the Settlement Agreement's description of the settlement payment in components that correspond to the arbitrator's $15,030,000 value for the

---

[8] Deductions are a matter of legislative grace, and Indeck bears the burden of proof with respect to the interest deduction at issue in its case. Rule 142(a); INDOPCO, Inc. v. Commissioner, 503 U.S. 79, 84 (1992). Sec. 7491(a), shifting the burden of proof to the Commissioner in certain circumstances, is not applicable here because the examination of Indeck's return commenced prior to July 22, 1998. See Internal Revenue Service Restructuring and Reform Act of 1998, Pub. L. 105-206, sec. 3001(c)(1), 112 Stat. 726.

shares and the arbitrator's award of interest at 10-percent per annum on $15,030,000 commencing January 31, 1991.  Indeck further cites Mr. Polsky's attorneys' representations to the Lake County Circuit Court--which occurred after the parties reached agreement on the final language of the Settlement Agreement--to the effect that the settlement included the arbitrator's award of interest at 10 percent from January 31, 1991, on $15,030,000.  Indeck contends that in the Settlement Agreement, the parties in substance agreed that Mr. Polsky should receive the arbitrator's $15,030,000 valuation for the shares, that he should have received this amount on January 31, 1991, and that consequently he should receive the arbitrator's award of 10-percent interest from that date as compensation for the delay in payment.[9]

Indeck's contentions regarding the substance of the parties' agreement cannot be reconciled with the Settlement Agreement. Contrary to Indeck's contentions, the written terms of the Settlement Agreement allocate the entire $19,886,922 payment to the "purchase price" of the shares.  As a party to the Settlement Agreement, Indeck may not offer an interpretation of the written

---

[9] As Indeck puts it on brief, under the settlement Mr. Polsky "was being paid for his stock, $501,000 per share [i.e., $15,030,000], plus interest from the date it was agreed * * * that such payment for his stock should have been made to him [i.e., Jan. 31, 1991]."  Thus, Indeck argues, the portion of the settlement payment exceeding $15,030,000 was paid to Mr. Polsky "as compensation for Indeck['s] * * * use of the money due Polsky from January 31, 1991 through May 9, 1994 [i.e., the closing date of the Settlement Agreement]" and is therefore interest.

agreement at variance with its clear terms except by adducing "strong proof" that the terms of the written instrument do not reflect the actual intentions of the contracting parties. Kreider v. Commissioner, 762 F.2d 580, 586 (7th Cir. 1985), affg. T.C. Memo. 1984-68; Major v. Commissioner, 76 T.C. 239, 247 (1981). If the written instrument is ambiguous, Indeck need offer only proof that satisfies a "'preponderance of the evidence'" standard to show the parties' true intentions. Kreider v. Commissioner, supra at 586 (quoting Major v. Commissioner, supra at 247).

While the Settlement Agreement's allocation of the entire payment to "purchase price" is on its face explicit and unambiguous, an argument exists that an ambiguity regarding any provision for interest is created by the Settlement Agreement's definition of Component (ii) as an amount equal to a percentage per annum of a stated sum over a designated period and its definition of Component (iii) as an amount equal to "interest" at the section 1274(d) rate on the same sum over a designated period. It is unnecessary for us to decide whether the Settlement Agreement is ambiguous, however, because even under the lesser "preponderance of the evidence" standard of proof, Indeck has not persuaded us that the parties to the Settlement Agreement intended any portion of the settlement payment as interest. To the contrary, the extrinsic evidence demonstrates

that the parties actually agreed to allocate the entire payment to purchase price.

The attorneys who negotiated the terms of the Settlement Agreement on behalf of Indeck and Mr. Polsky testified that interest was and was not intended, respectively. We found their testimony self-serving and accord it little weight. Far more reliable, and ultimately persuasive, with respect to the parties' intent are the contemporaneous draft versions of the Settlement Agreement that circulated between them during the negotiations covering the agreement.[10] As documented in greater detail in our fact findings, Indeck's attorneys, as drafters of the Settlement Agreement, attempted in various drafts to characterize Component (ii) (i.e., the amount equal to 10 percent per annum on $15,030,000 from January 31, 1991 through April 13, 1994) as "interest" and/or to distinguish it from "purchase price". Mr. Polsky's attorneys specifically rejected these efforts, and proposed language that deleted any reference to interest in respect of Component (ii) and instead described both Components

---

[10] We also find it unnecessary to rely on the testimony of Mr. Polsky in making our findings regarding the intentions of the parties to the Settlement Agreement, given the probative value of the draft versions of the Settlement Agreement. In this regard, Indeck sought to introduce evidence at trial concerning Mr. Polsky's compliance with certain other Federal and State income tax obligations, in an effort to impugn his credibility. We ruled such evidence inadmissable under rule 403 of the Federal Rules of Evidence.

(ii) and (iii)[11] as part of the "purchase price". Mr. Polsky's attorneys prevailed on this point, resulting in a final version of the Settlement Agreement that expressly allocates Components (ii) and (iii) to "purchase price"; defines "purchase price" as the sum of Components (i), (ii), and (iii), not merely as Component (i) (i.e., the $15,030,000 amount), as Indeck had initially sought; and does not anywhere describe Component (ii) as "interest", as Indeck had initially sought. Indeck's attorneys' failed efforts to denominate Component (ii) as "interest" or Component (i) as the "purchase price", and Mr. Polsky's attorneys' success in the face of these efforts in having Components (ii) and (iii) labeled as "purchase price", together convince us that Indeck and Mr. Polsky were fully cognizant of the allocation, negotiated it, and ultimately agreed that the allocation of the settlement payment would be made entirely to purchase price.

Moreover, Indeck never issued a Form 1099-INT to Mr. Polsky with respect to the $4,856,922 it claims was intended as interest. The explanation offered by Indeck's chief financial officer to the effect that the failure was a result of oversight is unconvincing, given the magnitude of the payment and its circumstances. A plausible inference from the failure is that

---

[11] As used in the Settlement Agreement, Component (iii) consisted of an amount equal to interest at the Federal funds rate on $15,030,000 between Apr. 14 and May 9, 1994.

Indeck, having agreed in the written Settlement Agreement to allocate the entire settlement payment to purchase price, had doubts that the parties had agreed to a payment of $4,886,922 of interest.

Overall, the extrinsic evidence persuades us that Indeck and Mr. Polsky agreed to allocate the entire $19,866,922 settlement payment to purchase price, notwithstanding any ambiguity concerning interest that might exist within the four corners of the Settlement Agreement. Accordingly, we reject Indeck's claim herein that $4,856,922 of the settlement payment was actually intended as interest by the parties to the Settlement Agreement. Although Indeck may have preferred an allocation of this amount to interest, as the drafts of the agreement prepared by its attorneys suggest, Mr. Polsky objected and prevailed. The parties' final, written agreement allocated the entire payment to purchase price.

Where there is an express allocation in a settlement agreement of a settlement payment, that allocation is generally respected for tax purposes if the agreement was entered into by the parties in an adversarial context at arm's length and in good faith. Bagley v. Commissioner, 105 T.C. 396 (1995), affd. 121 F.3d 393 (8th Cir. 1997); Robinson v. Commissioner, 102 T.C. 116 (1994), affd. in part and revd. in part 70 F.3d 34 (5th Cir. 1995). However, to be respected the allocation must reflect the

"reality" of the settlement, and the court must discern, based on all the facts and circumstances surrounding the settlement, "in lieu of what" the settlement amount was paid.  Robinson v. Commissioner, supra at 126; see also Bagley v. Commissioner, supra at 406.

It is beyond dispute that Indeck and Mr. Polsky entered the Settlement Agreement in an adversarial context at arm's length. The parties were tax adverse with respect to the characterization of any portion of the settlement payment as interest versus purchase price, as Indeck's ability to deduct the payment, and Mr. Polsky's recognition of it as ordinary or capital income, depended upon such characterization.  As outlined in our previous discussion of the evolution of the written terms of their agreement, the effort by Indeck's attorneys to label the $15,030,000 portion of the settlement payment as "purchase price" and the remainder as "interest", and Mr. Polsky's attorneys' rejection of those efforts and successful proffer of language denominating the entire payment as purchase price, convince us that the parties considered the allocation and agreed to an allocation of the entire payment to purchase price.  Thus, the allocation was the product of arm's-length, adversarial negotiations.

That leaves the question of whether the allocation reflected the "reality" or substance of the parties' agreement.  Indeck

contends that the agreement, in substance, was for a purchase price of $15,030,000 for the shares plus $4,856,922 of interest to compensate for the post-January 31, 1991, delay in payment. Indeck's contention is based, in part, on the Settlement Agreement's description of the settlement payment in components that correspond to the arbitrator's $15,030,000 value for the shares and his award of 10-percent interest on that amount commencing January 31, 1991. Indeck also points to representations by Mr. Polsky's attorneys to the Lake County Circuit Court in connection with the settlement describing the settlement payment as including "interest" at 10 percent from January 31, 1991, on $15,030,000, which occurred after agreement had been reached on the language in the Settlement Agreement allocating the entire payment to "purchase price".

It is obvious that the Settlement Agreement was modeled in substantial part on the arbitrator's value for the shares and his award of interest. The question remains, however, whether the parties' use of the arbitration award as a model indicates that they in substance agreed on a purchase price of $15,030,000 for the shares plus $4,856,922 in interest, or simply a purchase price equal to the total of the foregoing, as the Settlement Agreement allocation indicates.

Indeck argues that the parties' use of the arbitrator's award as a model for the settlement payment, and Mr. Polsky's

attorney's representations to the Lake County Circuit Court that the settlement payment included the arbitrator's award of interest, demonstrate that the parties agreed in substance that Mr. Polsky was entitled to receive $15,030,000 on January 31, 1991, and therefore was further entitled to $4,856,922 in interest to compensate him for the delay in payment of $15,030,000.  We disagree; it does not necessarily follow from the parties' use of the arbitrator's award to arrive at a settlement figure that they agreed to pay interest.  An inference equally consistent with their use of the arbitrator's award is the proposition that Mr. Polsky agreed to settle the dispute by selling his shares for the figure derived by employing the fiction that the arbitrator's award covering the shares had been confirmed and had not been paid.  This latter inference is likewise consistent with Mr. Polsky's attorneys' representations to the Lake County Circuit Court; their use of the term "interest" could be interpreted as a reference to the formula employed in reaching the agreed upon figure for settling the dispute.  Based on the facts and circumstances surrounding the settlement as outlined below, we conclude that the substance of the parties' agreement is consistent with a purchase price of $19,886,922 for the shares, as the written allocation in the Settlement Agreement provides.

We note first that in the Settlement Agreement, the parties were not just settling the Cook County Lawsuit (i.e., the pending appeal of the arbitrator's award of $15,030,000 for the shares). They were also settling the Lake County Lawsuit in which Mr. Polsky had advanced claims of considerably higher values for his shares. The claims for a higher value for the Indeck shares in the Lake County Lawsuit were based, inter alia, (i) on Mr. Polsky's theory that he was entitled to the shares' value as of June 1, 1993, due to his wrongful termination[12] (which value he estimated to be $55 million), and (ii) on the higher of the third-party offers for Indeck's stock, namely, the CMS Generation offer of $750,000 per share (or $22.5 million for Mr. Polsky's 30 shares), which had not been presented to the arbitrator.[13] Second, the settlement was prompted by developments in the Lake County Lawsuit, not the Cook County Lawsuit. Settlement discussions were initiated by Indeck when the presiding judge in the Lake County Lawsuit, after hearing the first witness's testimony, expressed his view that Indeck may have failed as a matter of law to meet its obligations to Mr. Polsky under the

---

[12] In this regard, it bears noting that the portion of the arbitrator's award finding that Mr. Polsky's termination had been in violation of the terms of the Employment Agreement was confirmed by the Cook County Circuit Court, and that portion of the decision was not appealed by Indeck.

[13] One of Indeck's own attorneys testified herein that Indeck's exposure in the Lake County Lawsuit was significantly greater than in the Cook County Lawsuit.

Shareholders' Agreement. Thus, we believe the settlement could be expected to reflect Indeck's exposure in the Lake County Lawsuit to the higher share values asserted there by Mr. Polsky (as compared to the $501,000 per share value awarded by the arbitrator and on appeal in the Cook County Lawsuit). Moreover, a plausible inference, if Indeck had failed to give reasonable assistance as the judge in the Lake County Lawsuit opined, would be that Indeck's failure to cooperate had tainted the third-party offer process and depressed the offer prices of PowerLink and CMS Generation. It would follow that the $15,030,000 value for the shares awarded by the arbitrator was too low. In any event, we are persuaded that, in practical terms, Mr. Polsky was in a superior bargaining position in the settlement negotiations, suggesting that he could obtain a value for his shares reflecting the higher claims advanced in the Lake County Lawsuit, rather than the $15,030,000 awarded by the arbitrator based on the PowerLink offer. In addition, nowhere in his pleadings in the Lake County Lawsuit did Mr. Polsky claim entitlement to 10-percent per annum interest on $15,030,000 commencing January 31, 1991.

Based on the foregoing, we are persuaded that in the settlement Mr. Polsky was well positioned to obtain a $19,886,922 purchase price for his shares and in substance did so, and that the arbitrator's award served merely as a formula for arriving at

that purchase price.  The parties' use of that formula was not tantamount to an agreement to pay $15,030,000 for the shares and the remainder as interest.  Accordingly, the facts and circumstances surrounding the settlement do not suggest that the parties' allocation fails to reflect the reality of their agreement.  See Bagley v. Commissioner, 105 T.C. 396 (1995); Robinson v. Commissioner, 102 T.C. 1161 (1994).

In support of its position that the written allocation of the entire payment to purchase price should be ignored, Indeck cites Rozpad v. Commissioner, 154 F.3d 1 (1st Cir. 1998), affg. T.C. Memo. 1997-528, Delaney v. Commissioner, 99 F.3d 20 (1st Cir. 1996), affg. T.C. Memo. 1995-378, and Smith v. Commissioner, 59 T.C. 107 (1972), cases where the courts disregarded the absence of an allocation to interest in written settlement agreements or a court order and instead found that a portion of the payment included interest income to the payee.[14]

Indeck's case is easily distinguishable.  We note first that the payor and payee in Rozpad, Delaney, and Smith were not tax adverse regarding the characterization of any portion of the payment as interest.  Also, the taxpayers in Rozpad and Delaney

_____

[14] Indeck also cites Kovacs v. Commissioner, 100 T.C. 124 (1993), affd. without published opinion 25 F.3d 1048 (6th Cir. 1994), but we believe that case is of marginal relevance.  In Kovacs, the issue was not whether interest formed some portion of a payment, but whether amounts conceded to be interest should be treated as part of the damages received on account of personal injury and therefore excludable from income under sec. 104(a)(2).

were seeking to uphold the written terms of their settlement agreement; Indeck seeks to disregard the written terms to which it agreed, bringing the principles of Kreider v. Commissioner, 762 F.2d 580 (7th Cir. 1985), into play.

More fundamentally, with respect to Rozpad and Delaney, the relationship between an appealable verdict and a closely proximate settlement thereof, as existed in those cases, does not obtain in Indeck's case. In Rozpad and Delaney, settlements were reached during the appeal period for verdicts obtained by the taxpayers. The settlement agreements did not allocate any portion of the settlement payments to interest, though the verdicts had included substantial interest components. In each case the court sustained the Commissioner's determination that the settlement payment contained interest in the same proportion that the interest awarded in the verdict bore to the total amount awarded in the verdict, notwithstanding the absence of any allocation to interest in the written settlement agreement.

The straightforward causal relationship between the verdict and settlement in Rozpad and Delaney is not present in the instant case between the arbitrator's award and the Settlement Agreement. The Settlement Agreement was prompted by developments in the Lake County Lawsuit, not the pending appeal of the arbitrator's award in the Cook County Lawsuit. The Settlement Agreement was not a compromise of the arbitrator's award for a

lesser amount; under the Settlement Agreement, the value of the arbitrator's award was essentially paid in full.  Instead of merely compromising the arbitrator's award, the Settlement Agreement settled a broader array of claims for significantly higher share values advanced by Mr. Polsky in the Lake County Lawsuit.  Although the Cook County Lawsuit was also dismissed as part of the Settlement Agreement, this feature was incidental to the primary focus of the settlement, which was to resolve Indeck's exposure in the Lake County Lawsuit.  Consequently, the arbitrator's award is not analogous to the appealable verdicts in Rozpad and Delaney, and provides no basis for disregarding the written allocation between purchase price and interest provided in the Settlement Agreement.

Smith v. Commissioner, supra, is likewise not persuasive authority for Indeck's treatment of the disputed amounts as interest.  Smith concerned a situation where the parties' written settlement agreement stated that the settlement payment included interest, but a court order implementing the settlement did not, providing the taxpayer-payee with his opportunity to argue that the payment did not include interest.  Based on the settlement agreement's written terms covering interest, the taxpayer's entitlement to interest under State law in connection with the condemnation that was the subject of the settlement, and the State government payor's documentation showing it intended to pay

interest, we concluded that interest had been received by the taxpayer. No comparable situation exists in Indeck's case; Mr. Polsky was not entitled to interest under a statute, and the Settlement Agreement specifically negates any contractual entitlement.

Requirement of Indebtedness

We also agree with respondent and the Polskys that the disputed $4,856,922 portion of the settlement payment cannot constitute interest deductible under section 163(a) by Indeck because there was no indebtedness within the meaning of that section.

In order for an amount to constitute interest deductible under section 163(a), it must have been paid or accrued on "indebtedness". Midkiff v. Commissioner, 96 T.C. 724 (1991), affd. sub nom. Noguchi v. Commissioner, 992 F.2d 226 (9th Cir. 1993); Jordan v. Commissioner, 60 T.C. 872 (1973), affd. 514 F.2d 1209 (8th Cir. 1975); Williams v. Commissioner, 47 T.C. 689 (1967), affd. 409 F.2d 1361 (6th Cir. 1968); Kaempfer v. Commissioner, T.C. Memo. 1992-19. Indebtedness for this purpose is "an existing, unconditional, and legally enforceable obligation for the payment of a principal sum". Howlett v. Commissioner, 56 T.C. 951, 960 (1971); see also Midkiff v. Commissioner, supra at 744; Jordan v. Commissioner, supra at 881; Williams v. Commissioner, supra at 692. In addition, the amount

of the indebtedness must have been fixed as of the date the purported interest began to accrue.  Midkiff v. Commissioner, supra at 739-740; see also Halle v. Commissioner, 83 F.3d 649 (4th Cir. 1996), revg. on other grounds Kingstowne v. Commissioner, T.C. Memo. 1994-630.

Indeck contends that this amount is deductible interest because the parties to the Settlement Agreement intended it as such; namely, as compensation to Mr. Polsky for the delay in receiving payment for his shares between January 31, 1991 and May 9, 1994.  Indeck further argues that the statutory requirement of indebtedness is satisfied because Indeck had an "unconditional obligation" under the Shareholders' Agreement to purchase Mr. Polsky's shares at a price determined by third-party offers, and this obligation was confirmed by the arbitrator's decision requiring Indeck to purchase Mr. Polsky's shares at the PowerLink offer price (i.e., $15,030,000) as of January 31, 1991 (the date PowerLink's offer was received), with 10-percent interest until payment in full.

We conclude that the disputed $4,856,922 portion of the settlement payment is not interest for purposes of section 163(a) because it was not paid on indebtedness--that is, it was not paid with respect to an existing, legally enforceable obligation for the payment of a principal sum, nor was the amount of the

obligation fixed as of the date the purported interest began to accrue.

Indeck had no existing, legally enforceable obligation to pay a discernible sum for Mr. Polsky's shares prior to May 15, 1994, the date by which closing was to occur under the Settlement Agreement. Indeck urges that it had an "unconditional obligation" to purchase Mr. Polsky's shares under the Shareholders' Agreement, as a result of his involuntary termination, at a price determined by the highest bona fide offer received for Indeck's outstanding shares within one year of the termination. But the Shareholders' Agreement's formula for setting the purchase price of Mr. Polsky's shares was far too indefinite to give rise to indebtedness. The terms of the Shareholders' Agreement allowed Indeck to contend that the third-party offers obtained by Mr. Polsky to set the price were not bona fide (as Indeck in fact contended during the period that the purported indebtedness gave rise to interest). For his part, Mr. Polsky contended that, under the combined terms of the Employment and Shareholders' Agreements, the price to be paid for his shares should be measured as of the expiration of his term of employment. In short, upon Mr. Polsky's termination, the parties vigorously disputed the terms of Indeck's obligation to purchase Mr. Polsky's shares.

Their dispute first went to arbitration, in a proceeding initiated by Mr. Polsky in September 1990. Mr. Polsky contended, inter alia, that because his termination had been wrongful, he was entitled to the value of his shares as of the June 1, 1993, expiration of his employment term under the Employment Agreement,[15] at which time the shares would have appreciated to $56.3 million, in present value terms, he claimed. Alternatively, Mr. Polsky claimed that the $501,000 per share PowerLink offer set a floor, but not a ceiling, on the value of his shares. In response, Indeck took the position that the arbitrator lacked jurisdiction to consider the value or sale of Mr. Polsky's shares. Then, by letter dated October 1, 1991, Indeck took the position that since no bona fide offers for its stock had been received within the year following Mr. Polsky's termination, the price for his shares should be set under the net

---

[15] Mr. Polsky's position was far from frivolous, as Indeck's own counsel advised its board of directors in February 1991 that if Mr. Polsky's termination were found to be wrongful, he had no obligation to sell his shares to Indeck until the June 1, 1993, expiration of his term of employment under the Employment Agreement.

Mr. Polsky's position, and the advice given by Indeck's attorney, were apparently based on the fact that the Shareholders' Agreement's provisions governing Indeck's purchase of Mr. Polsky's shares in the event of his involuntary termination presupposed a termination effected in accordance with the provisions of the Employment Agreement. Mr. Polsky contended that his termination violated the Employment Agreement, and the arbitrator subsequently agreed. The portion of the arbitration award covering damages for wrongful termination was confirmed and not appealed by Indeck.

book value method provided in the Shareholders' Agreement.  Under that method, Indeck advised it owed Mr. Polsky zero for the shares.  In sum, given the circumstances of Mr. Polsky's termination, the timing and amount of Indeck's obligation with respect to the purchase of Mr. Polsky's shares was unclear under the Shareholders' Agreement and vigorously disputed.

The arbitrator issued an award on November 27, 1991, in which he concluded that Indeck had wrongfully terminated Mr. Polsky, and that Indeck must pay damages of $6,638,000, plus $15,030,000[16] ($501,000 per share) for Mr. Polsky's 30 shares of Indeck, with interest at 10 percent per annum commencing January 31, 1991.  It is apparent, and the parties herein do not dispute, that the arbitrator based his $501,000 per-share value and his interest commencement date on the PowerLink offer, which was made in that amount and received on that date.  Thus, the principal amount of $15,030,000, payable as of January 31, 1991, represents the arbitrator's determination of Indeck's obligation to Mr. Polsky, presumably on the grounds that the PowerLink offer was bona fide and within the 1-year period following termination,

---

[16] Although the arbitrator's award stated the monetary damages only as an aggregate total of $21,668,800, the parties herein do not dispute that this total represented $15,030,000 for Mr. Polsky's 30 shares, given that the arbitrator valued seven other Indeck shares (not at issue herein) at $501,000 per share.

triggering Indeck's obligation under the Shareholders' Agreement to purchase Mr. Polsky's shares at the PowerLink offer price.[17]

While the arbitration award contained a fixed amount and a due date for Indeck's obligation, this portion of the award never became legally enforceable.  When Mr. Polsky sought to have the award confirmed, the Cook County Circuit Court, on Indeck's motion, vacated the award insofar as it covered the Indeck shares, on the grounds that the arbitrator lacked jurisdiction.[18]

---

[17] It bears noting that, in setting the obligation's due date at Jan. 31, 1991, and the interest rate at 10 percent, the arbitrator went outside of, indeed contradicted, the terms of the Shareholders' Agreement.  The Shareholders' Agreement provided that the closing date for the purchase of Mr. Polsky's shares need not occur until 13 months after his termination date (which would have been Oct. 22, 1991), that only 20 percent of the purchase price need be paid on that date, and that the remainder could be paid in periodic installments, bearing interest at the rate provided in sec. 1274(d).  Thus, to the extent Indeck claims it had an "unconditional obligation", based on the Shareholders' Agreement, to pay Mr. Polsky $15,030,000 on Jan. 31, 1991, that claim is inaccurate.  The Jan. 31, 1991, due date, as well as the requirement that the entire balance be paid on that date, arose entirely from the arbitrator's Nov. 21, 1991, interpretation of Indeck's obligation.

The arbitration award does not indicate whether the arbitrator's determination to impose a more onerous due date and payment terms than those provided in the Shareholders' Agreement was based upon his conclusion that Mr. Polsky's termination was in violation of the Employment Agreement, thereby voiding the payment schedule provided in the Shareholders' Agreement.

[18] Under Illinois law, an award in arbitration does not become an enforceable judgment until it has been confirmed by a circuit court of that State.  710 Ill. Comp. Stat. 5/11, 5/14, 5/16 (1999).  Confirmation may not occur until 90 days after delivery of the award to each party, during which time a party may make application to the court to have the award vacated or

(continued...)

The order in the Cook County Lawsuit vacating this portion of the arbitration award remained on appeal until Indeck and Mr. Polsky agreed as part of the Settlement Agreement to dismiss the appeal.

Two months after the arbitration award was vacated, Mr. Polsky commenced the Lake County Lawsuit, wherein he maintained his contention that, due to his wrongful termination, he was owed the value of his shares as of June 1, 1993 (i.e., not the value determined by third-party offers received during the year following his September 1990 termination). He claimed the amount due him for his shares under this theory was not less than $55 million. Moreover, he advanced claims premised upon the higher ($750,000 per share) offer received from CMS Generation for Indeck's outstanding shares on August 6, 1991, which had not been presented to the arbitrator. Indeck, for its part, maintained its position that the amount it owed Mr. Polsky for his shares depended upon their net book value as provided in the Shareholders' Agreement, since no bona fide offers for Indeck's shares had been received within the requisite period provided in the agreement.

Thus, during the more than 3-year period that Indeck claims interest was accruing on a $15,030,000 indebtedness due January 31, 1991, the parties were in fact vigorously disputing the

---

[18](...continued)
modified. Id. at 5/11, 5/12, 5/13.

obligation, both as to amount and due date. During this period, the only significance of the January 31, 1991, due date (rather than, e.g., August 6, 1991; June 1, 1993; or some other date) and the $15,030,000 amount (rather than some other figure) rested in an arbitration award that had been vacated before confirmation. Consequently, during the period from January 31, 1991, through May 9, 1994, in which Indeck contends section 163(a) interest accrued, Indeck's obligation to Mr. Polsky was neither fixed in amount nor legally enforceable. As such, it was not indebtedness giving rise to interest under section 163(a). See Midkiff v. Commissioner, 96 T.C. 724 (1991); Jordan v. Commissioner, 60 T.C. at 881-882.

Jordan v. Commissioner, supra, is instructive on this point. In that case, the taxpayer participated in the sale of stock to investors who subsequently sued him, alleging securities law violations in connection with the sale of the stock. In response to the lawsuits, the taxpayer offered to rescind the sale by repurchasing the stock for its original purchase price plus "interest" at the rate of 5 percent per annum from the date of the original sale until the repurchase. The stock was repurchased by the taxpayer pursuant to the rescission offer, and the taxpayer claimed an interest deduction under section 163(a) for the amounts denominated as 5 percent interest under the terms of the offer. We sustained the Commissioner's disallowance of

the deduction on the grounds that no indebtedness for purposes of section 163 existed, concluding instead that the 5 percent "interest" was merely part of the purchase price of the stock. As with the taxpayer in Jordan, Indeck's payment of an amount denominated as interest to settle a dispute, even where stated as a percentage per annum of a designated amount, does not entitle it to an interest deduction where indebtedness did not exist.

Indeck's obligation to Mr. Polsky with respect to the purchase of his shares did not become fixed in amount or enforceable until the parties reached an agreement on April 13, 1994, pursuant to which Mr. Polsky would transfer his shares, and Indeck would become obligated to make payment, on or before May 15, 1994. As a consequence, Indeck had no indebtedness to Mr. Polsky prior to May 15, 1994,[19] and no interest for purposes of section 163(a) could have accrued prior to that date.

Indeck cites Halle v. Commissioner, 83 F.3d 649 (4th Cir. 1996), revg. on other grounds Kingstowne v. Commissioner, T.C. Memo. 1994-630, and Dunlap v. Commissioner, 74 T.C. 1377 (1980), revd. on other grounds 670 F.2d 785 (8th Cir. 1982), in support

---

[19] The evidence persuades us that Indeck incurred an existing, legally enforceable obligation to pay Mr. Polsky a designated sum, on Apr. 13, 1994--the date on which the parties reached an oral agreement to settle and described that agreement on the record to the judge presiding in the Lake County Lawsuit, who dismissed the case on that basis. Indeck's obligation, however, was to pay Mr. Polsky a designated sum on or before May 15, 1994.

of its position.  However, those cases are distinguishable in a
key respect.  In both, there was agreement between the purported
debtor and creditor as to the amount of the obligation and its
due date, as of the time the purported interest began to accrue.
Here, the amount of Indeck's obligation, and its due date, were
disputed during the period that the bulk of the claimed interest
purportedly accrued.

In Halle, the Court of Appeals for the Fourth Circuit,
reversing our opinion in Kingstowne,[20] held that an agreement for
the purchase of stock at a specified price and settlement date
created indebtedness on the part of the purchaser such that the
purchaser's payments to defer settlement beyond the agreed-upon
settlement date constituted interest for purposes of section
163(a) rather than additional purchase price.  Indeck likens the
disputed $4,856,922 portion of the settlement payment here to the
payments made by the purchaser in Halle to defer the settlement
date of the stock purchase--that is, as a payment for the
forbearance of money owed.  But a critical distinction exists.

---

[20] Because Halle v. Commissioner, 83 F.3d 649 (4th Cir.
1996), revg. on other grounds Kingstowne v. Commissioner, T.C.
Memo. 1994-630, is fully distinguishable from the facts of this
case and is not inconsistent with our holding herein that Indeck
has not established indebtedness for purposes of sec. 163(a), we
have no occasion to reconsider our holding in Kingstowne that the
purchase agreement at issue in that case created merely an option
to purchase rather than an indebtedness.  See Golsen v.
Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir.
1971).

In <u>Halle</u>, the mutual agreement of the purchaser and seller covering a purchase price and settlement date, as well as the additional compensation due the seller if the settlement date were deferred, persuaded the court that the parties had contractually established an indebtedness. With respect to the obligation found there to be indebtedness, there was agreement between the purchaser and seller covering the amount of the obligation, as of its due date, as well as agreement covering the due date itself.

Indeck can meet neither of those conditions with respect to the obligation it claims is indebtedness. Prior to the Settlement Agreement, the amount and timing of any obligation Indeck owed Mr. Polsky for his shares depended upon the terms of the Shareholders' Agreement, the interpretation of which was disputed by the parties. The only adjudication of those terms, by an arbitrator, had been vacated before ripening into an enforceable judgment. The contractual arrangement between Indeck and Mr. Polsky that might have passed muster as indebtedness under the standard employed in <u>Halle</u> was the Settlement Agreement, as it fixed the amount of Indeck's obligation and its due date. But under the Settlement Agreement, Indeck was not required to make payment before May 15, 1994; there was no forbearance of money by Mr. Polsky until that date and thus no interest for purposes of section 163(a).

Similarly, in Dunlap v. Commissioner, supra, we found indebtedness for purposes of section 163(a) notwithstanding the fact that the obligation on which the purported interest accrued remained subject to a condition precedent (namely, Federal Reserve Board approval of the underlying transaction) during a substantial portion of the period in which the claimed interest accrued. The condition precedent was outside the control of the taxpayer claiming the interest deduction. But in Dunlap, the purported debtor and creditor had agreed on the amount of the obligation and the date on which the obligation would become due, in advance of the commencement of interest. As we explained in distinguishing Dunlap in a later case: "the amount of the indebtedness upon which interest accrued in Dunlap * * * was fixed as of the date that the interest began to accrue." Midkiff v. Commissioner, 96 T.C. at 739. In the instant case, the amount Indeck owed Mr. Polsky for his shares was not fixed until more than 3 years after the January 31, 1991, date on which Indeck asserts interest began to accrue.

In relying on Dunlap and emphasizing that it had an "unconditional obligation" under the Shareholders' Agreement to purchase Mr. Polsky's shares, Indeck may be suggesting that it is entitled to an interest deduction under the principles of Dunlap because its obligation to pay $15,030,000 to Mr. Polsky for the shares was only subject to contingencies outside its control

(e.g., an adjudication determining that the PowerLink offer was bona fide).  In other words, Indeck may be suggesting that the Shareholders' Agreement imposed upon it an obligation to purchase the shares, at a price prescribed in the agreement, subject only to the contingency that ascertainment of the price required a final determination of whether a bona fide offer had been made. Thus, the argument apparently goes, Indeck's unconditional obligation to purchase qualifies as indebtedness for purposes of section 163(a).

Such an argument must fail.  While Indeck may have had an unconditional obligation under the Shareholders' Agreement to purchase Mr. Polsky's shares upon the termination of his employment, the terms of that obligation were too indefinite as to amount and timing to constitute indebtedness.  As noted, the amount and timing of the obligation deemed indebtedness in Dunlap were fixed; Indeck's obligation was not fixed in amount and timing until the parties reached an agreement to settle.  Cf. Deputy v. duPont, 308 U.S. 488, 497 (1940) ("although an indebtedness is an obligation, an obligation is not necessarily an 'indebtedness' within the meaning of * * * [the predecessor of section 163(a)].").  Moreover, unlike the case in Dunlap, the amounts paid by Indeck were not paid because contingencies outside Indeck's control resolved in a manner that fixed the obligation.  The purported interest payment here was paid because

Indeck and Mr. Polsky reached an agreement over it, a contingency well within Indeck's control.  Indeck instead could have opted not to settle and taken its chances with a decision in the Lake County Lawsuit.

Judicial Estoppel

Indeck also argues that the Polskys are precluded under the doctrine of judicial estoppel from maintaining in this proceeding that the settlement payment did not contain interest, because Mr. Polsky took an inconsistent position in the Lake County Lawsuit when his counsel represented to that court that the settlement payment included $4,856,922 in interest.

Judicial estoppel has been applied in this Court to prevent a party from maintaining a position that is inconsistent with a prior position advanced and accepted in this or another court. See, e.g., Huddleston v. Commissioner, 100 T.C. 17, 26-30 (1993). There are differences among the Courts of Appeals regarding the contours of judicial estoppel.  Compare Teledyne Indus., Inc. v. NLRB, 911 F.2d 1214, 1219 (6th Cir. 1990) (settlements do not give rise to judicial estoppel unless court in prior proceeding had duty to ensure fairness of settlement) with Kale v. Obuchowski, 985 F.2d 360, 361-362 (7th Cir. 1993) (settlement gives rise to judicial estoppel if party prevailed on basis of prior inconsistent contention).  For purposes of the instant cases, we shall apply judicial estoppel as that doctrine has been

delineated by the Court of Appeals for the Seventh Circuit, where appeal in these cases would ordinarily lie.  See Golsen v. Commissioner, 54 T.C. 742 (1970), affd. 445 F.2d 985 (10th Cir. 1971).

As espoused by the Court of Appeals for the Seventh Circuit, judicial estoppel is applied only where the prior position is "clearly inconsistent" and the party to be estopped convinced the court to accept its position in the earlier litigation.  In re Cassidy, 892 F.2d 637, 641 (7th Cir. 1990).  In the view of the Court of Appeals for the Seventh Circuit, the requisite acceptance by the court may occur where there has been either a judgment or a settlement in the earlier litigation.  Kale v. Obuchowski, supra at 361-362.  The Court of Appeals for the Seventh Circuit has summarized the doctrine as follows:

> The doctrine of judicial estoppel requires * * * that the party sought to be estopped have obtained a favorable judgment or settlement (Kale v. Obuchowski, * * *) on the basis of a legal or factual contention that he wants to repudiate in the current litigation. * * *  [McNamara v. City of Chicago, 138 F.3d 1219, 1225 (7th Cir. 1998).]

Judicial estoppel rests with the court's discretion and is "'applied with caution to avoid impinging on the truthseeking function of the court'".  Levinson v. United States, 969 F.2d 260, 265 (7th Cir. 1992) (quoting Teledyne Indus., Inc. v. NLRB, supra at 1219; see also Fazi v. Commissioner, 105 T.C. 436, 445 (1995).

In the circumstances of this case, we conclude that judicial estoppel should not be applied. First, Indeck has not shown a clear inconsistency between the positions taken by Mr. Polsky in the Lake County Lawsuit and in the instant proceedings. In the motion to enforce settlement in the Lake County Lawsuit, Mr. Polsky's counsel took the position that, under State law, Indeck had a contractual obligation arising out of the settlement to pay "interest" of $4,856,922. Whether that amount constituted interest for Federal income tax purposes, deductible under section 163(a), was not a necessary implication of Mr. Polsky's position in the motion to enforce settlement in the Lake County Lawsuit. The item's treatment for Federal income tax purposes was simply not at issue in the State court proceedings to accept or to enforce the settlement. Cf. Folio v. City of Clarksburg, 134 F.3d 1211 (4th Cir. 1998) (for purposes of judicial estoppel, party's position in State court proceedings that assessment was a fee under State law not inconsistent with claim that it was a tax under Federal law in later proceedings); UNUM Corp. v. United States, 886 F. Supp. 150 (D. Me. 1995) (for purposes of judicial estoppel, party's position with State regulators that distribution of stock was exchange not inconsistent with position for Federal income tax purposes that distribution was dividend).

Second, Indeck has not shown that the court in the Lake County Lawsuit accepted a position of Mr. Polsky's that is

inconsistent with his position herein.  To do so, Indeck would have to show, as enunciated by the Court of Appeals for the Seventh Circuit, that Mr. Polsky "obtained a favorable * * * settlement * * * on the basis of a legal or factual contention that he wants to repudiate" in these proceedings.  McNamara v. City of Chicago, supra at 1225.

The Court of Appeals for the Seventh Circuit adopted the position that judicial estoppel may arise from a mere settlement, rather than a judicial decision, in Kale v. Obuchowski, supra.  In that case, the party estopped had denied in State court divorce proceedings that he held any interest in real property other than the marital home and had obtained a favorable property settlement on that basis as part of the proceedings.  When the party subsequently sought to enforce an alleged interest in an industrial park in bankruptcy proceedings, the Court of Appeals affirmed the bankruptcy court's ruling that the party was judicially estopped from asserting any interest in the industrial park.

No comparable advantage was secured by any contention of Mr. Polsky's in connection with the settlement of the Lake County Lawsuit.  In those proceedings, Mr. Polsky did not obtain a favorable settlement by prevailing in a contention that, for Federal income tax purposes, he was entitled to treat $15,030,000 of the settlement payment as capital gain proceeds and $4,856,922

as ordinary interest income, while Indeck was entitled to deduct the latter as interest pursuant to section 163(a).  The Federal income tax treatment of the settlement payment to either party was not argued by Mr. Polsky.  Nothing in the record suggests that the Federal income tax treatment was material or even considered in the court's decision to approve or enforce the settlement.  See UNUM Corp. v. United States, supra (judicial estoppel does not preclude assertion of position on Federal income tax treatment in subsequent proceeding where such treatment not material to decision in earlier State proceedings). Mr. Polsky's assertion in the Lake County Lawsuit that the agreed upon settlement payment included "interest" did not secure for him any advantage in that proceeding.  At most, the Lake County Circuit Court accepted a formula for arriving at a payment to be made by Indeck for Mr. Polsky's shares, without regard to the Federal income tax implications for either party.

We conclude that Indeck has not shown a clear inconsistency in Mr. Polsky's positions in the Lake County Lawsuit and herein, or that Mr. Polsky secured a favorable settlement on the basis of a contention that $4,856,922 of the settlement payment was interest.  We accordingly reject the application of judicial estoppel in these cases.[21]

---

[21] Indeck also argues, for the first time in its reply brief, that the doctrine of equitable estoppel should be applied
(continued...)

Conclusion

Based on the foregoing, we sustain respondent's determination disallowing a $4,856,922 interest deduction claimed by Indeck on its return for the taxable year ended in 1994 and do not sustain respondent's determination recharacterizing, as interest income, $4,856,922 of $19,866,922 reported by the Polskys on their 1994 return as long-term capital gain.

Section 6662 Accuracy-Related Penalty

Respondent determined section 6662(a) accuracy-related penalties against all petitioners for their taxable years ended

---

[21](...continued)
to preclude the Polskys from maintaining that the entire settlement payment consisted of purchase price for Mr. Polsky's shares.  We do not consider this issue, as it has not been properly raised in these cases.  Issues raised for the first time in posttrial briefs are not considered where there is surprise and prejudice to the opposing party.  Seligman v. Commissioner, 84 T.C. 191, 198-199 (1985), affd. 796 F.2d 116 (5th Cir. 1986).  Where as here the issue is raised for the first time in a reply brief, the prejudice is manifest; neither the Polskys nor respondent had any opportunity to respond to Indeck's attempt to raise equitable estoppel.

Even if this issue had been properly raised, we would reject Indeck's argument.  Indeck claims equitable estoppel should apply here because Mr. Polsky's attorneys represented to Indeck's attorneys that the changes sought by Mr. Polsky in the language of the Settlement Agreement, whereby the three components of the settlement payment were re-labeled "purchase price", were "non-substantive".  Suffice it to say that if Mr. Polsky's attorneys in fact characterized the language changes as alleged, their statements concerned matters of opinion or law, not fact.  Cf. Union Tex. Intl. Corp. v. Commissioner, 110 T.C. 321, 327 (1998) (party seeking equitable estoppel must show, inter alia, that it relied on a misrepresentation of fact, as opposed to an opinion or statement of law).

in 1994.  On brief, respondent now concedes the penalty with respect to the Polskys but argues that Indeck is liable for an accuracy-related penalty due to an underpayment attributable to a substantial understatement of tax or to negligence or disregard of rules or regulations.

Section 6662 imposes a penalty equal to 20 percent of the portion of an underpayment of tax that is attributable to negligence or disregard of rules or regulations, or a substantial understatement of income tax.  See sec. 6662(a) and (b)(1) and (2).

In the case of a corporation, a substantial understatement of income tax exists if the amount of the understatement exceeds the greater of 10 percent of the tax required to be shown on the return, or $10,000.  Sec. 6662(d)(1).  An "understatement" is defined as the excess of tax required to be shown on the return over the amount of tax imposed which is shown on the return, less any rebate.  Sec. 6662(d)(2)(A).  The amount of the understatement is reduced, however, to the extent it is attributable to the tax treatment of any item for which there is or was substantial authority for the treatment, and an authority for this purpose includes a court case.  Sec. 1.6662-4(d)(3)(iii), Income Tax Regs.

Indeck marshaled a number of cases to support its treatment of the disputed portion of the settlement payment.  While we have

concluded that those cases are distinguishable, we are satisfied that they constitute substantial authority for Indeck's treatment.  Accordingly, to the extent Indeck's understatement of tax is attributable to its deduction of $4,856,922 of the settlement payment, it is reduced pursuant to section 6662(d)(2)(B)(i).  See sec. 1.6662-4(d)(3)(ii), Income Tax Regs.

Respondent asserts in the alternative that Indeck is liable for a section 6662(a) penalty because the underpayment arising from Indeck's disallowed interest deduction is attributable to negligence or disregard of rules or regulations.  See sec. 6662(b)(1).  In this context, "negligence" includes a failure to make a reasonable attempt to comply with the provisions of the internal revenue laws or to exercise ordinary and reasonable care in the preparation of a tax return, and "disregard" is characterized as any careless, reckless, or intentional disregard.  Sec. 6662(c); sec. 1.6662-3(b)(1) and (2), Income Tax Regs.  A position with respect to an item is attributable to negligence if it lacks a reasonable basis.  Sec. 1.6662-3(b)(1), Income Tax Regs.  Respondent's regulations applicable to Indeck's return for the taxable year ended in 1994 do not provide a definition of reasonable basis, but provide that it is a standard that is significantly higher than the "not frivolous" standard applicable under section 6694 and defined in section 1.6694-

2(c)(2), Income Tax Regs.[22]  Sec. 1.6662-7T(d)(2), Temporary Income Tax Regs., 59 Fed. Reg. 12549 (Mar. 17, 1994).  Because Indeck had substantial authority for its treatment of $4,856,922 as deductible interest, we are satisfied that it also had a reasonable basis under the applicable regulations and therefore was not negligent, nor did it carelessly, recklessly, or intentionally disregard any rule or regulation.  Accordingly, we do not sustain respondent's determination of the accuracy-related penalty based on negligence or disregard of rules of regulations.

To reflect the foregoing,

<u>Decision will be entered under Rule 155 in docket No. 21586-97</u>.

<u>Decision will be entered for petitioners in docket No. 23943-97</u>.

---

[22] For Indeck's taxable year ended in 1994, a definition of "reasonable basis" was reserved in sec. 1.6662-3(b)(3), Income Tax Regs.  The definition was provided by subsequent amendment to sec. 1.6662-3(b)(3), Income Tax Regs., applicable to returns filed on or after Dec. 2, 1998.  Sec. 1.6662-2(d)(4), Income Tax Regs.